UNITED STATES BANKRUTPCY COURT
DISTRICT OF COLORADO

In re

LBH NATIONAL CORPORATION
EIN: 46-4574404

Debtor.

Chapter 11

Case No.:  16-16247-MER

## NOTICE OF PERFECTION OF SECURITY INTEREST IN PROPERTY AND OBJECTION TO USE OF CASH COLLATERAL

ERA Franchise Systems LLC ("ERA"), by and through its attorneys, LeClair Ryan, a professional corporation, hereby: (a) declares that ERA possesses a validly perfected senior lien and security interest on property of LBH National Corporation ("Debtor" or "LBH"); (b) demands that the Debtor segregate and account for any cash collateral now in the possession, custody or control of the Debtor, and which the Debtor may in the future collect or receive; (c) objects to the Debtor's use of ERA's cash collateral; and (d) to the extent the Debtor is authorized by Court order to use any of ERA's cash collateral, ERA demands adequate protection for any such use.  In support thereof, ERA represents and states as follows:

1.      LBH and ERA entered into a Real Estate Franchise Agreement with an effective date of February 25, 2014 (the "Franchise Agreement"). A copy of the Franchise Agreement is attached hereto at **Exhibit "A"**.  By virtue of the Franchise Agreement, LBH became a franchisee of ERA and was authorized to operate a real estate brokerage business initially at eighteen offices located in California (collectively, the "Approved Locations").

2.      On or around February 20, 2014, LBH, Roger A. Herman and Kimberly S. Herman

executed and conveyed a Conversion Promissory Note to ERA in the original principal amount of $1,500,000 (the "Conversion Note"). A copy of the Conversion Note is attached at Exhibit **"B"** hereto.

3.    To secure the obligations of LBH under the Franchise Agreement, Conversion Note and all other agreements between LBH and ERA, LBH executed and conveyed a Security Agreement to ERA which granted ERA a security interest in: ". . . *all accounts, accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in [LBH's] business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by [LBH] and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which [LBH] may be entitled pursuant to any franchise Agreement entered into with [ERA], together with all such rights and property hereafter acquired by [LBH], and all general intangibles (collectively the "Collateral"), as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral. . . ."*

The Collateral identified in the Security Agreement is referred to as the "ERA Collateral". A copy of the Security Agreement is attached at Exhibit **"C"** hereto.

4.    The security interest granted to ERA was perfected by ERA by, among other things, the filing of UCC-1 Financing Statement on February 25, 2014 with the Secretary of State of

California at filing number 20147400723583.  A copy of the UCC-1 financing statement is attached at **Exhibit "D"** hereto.

5.    On February 22, 2016, ERA filed a Complaint in the Superior Court of California, County of Los Angeles, against LBH and others, Case No.: YC071137, (the "California Action").  In the California Action, among other things, ERA asserts that: (a) LBH breached its obligations under the Franchise Agreement, Note and Security Agreement (collectively, the "Agreements"); (b) LBH failed to cure noticed defaults under the Agreements; (c) ERA terminated the Franchise Agreement, accelerated the amounts due under the Note and demanded compliance by LBH of its obligations under the Security Agreement; and (d) LBH is indebted to ERA in an amount in excess of $6,000,000 under the Agreements.

6.    On April 28, 2016, a Temporary Restraining Order (the "TRO") was entered in the California Action which, among other things, directed: "*[t]hat ERA Franchise System, LLC's Collateral, and the proceeds thereof, shall not be used by LBH except to pay for budgeted and current ordinary course of business operating expenses (the "Approved Expenses") and, in particular, shall not be used to make distributions to Roger A. Herman or in connection with any intercompany transfer (including transfers to THG, LLC or Sunbelt Realty, Inc.) or to pay antecedent debt to creditors junior to ERA Franchise Systems, LLC (including Prudential and Community Bank). All proceeds of the Collateral which are not used to satisfy Approved Expenses shall be held by LBH in a segregated escrow account (the "Escrow Account") and shall not be disbursed pending further Order of this Court.*"

A copy of the TRO is attached at **Exhibit "E"** hereto.

7.    On June 15, 2016, an order was entered in the California Action granting possession of ERA Collateral to ERA (the "Possession Order").  A copy of the Possession Order

is attached at **Exhibit "F"** hereto.  Pursuant to Section 5g of the Possession Order, LBH was ". . . ordered to transfer possession of the property described in item 3c to . . ." ERA.  As noted in the Possession Order: "[f]ailure to comply with an order of the court to turn over possession of such property to the plaintiff may subject [LBH] to being held in contempt of court."  In addition, Section 5f of the Possession Order authorized the sheriff/marshal to enter into LBH places of business to take possession of the subject property identified in the order.

8.      Despite demand, LBH did not comply with the Possession Order.  Despite demand, none of the ERA Collateral has been identified, marshalled or turned over to ERA.

9.      To the extent any further perfection of ERA's lien, security interest and/or possessory interest in the ERA Collateral (as described above) may be required by any other means or any other action, ERA hereby perfects its security interests pursuant to 11 U.S.C. § 546(b) and any applicable non-bankruptcy law.

10.      Pursuant to the Security Agreement, all parts, replacements, substitutes, profits, products and cash and non-cash proceeds of the ERA Collateral constitute "cash collateral" within the meaning of 11 U.S.C. § 363.

11.      ERA noticed counsel for the Debtor of ERA's objection to the use of its cash collateral on June 23, 2016.  ERA continues to object to the use of its cash collateral by LBH.

12.      ERA demands that the Debtor segregate and account for any cash collateral now in the possession, custody or control of the Debtor, and which the Debtor may in the future collect or receive.

13.      Without waiving or compromising its objection to the Debtor's use of its cash collateral, to the extent the Debtor is authorized to use any of ERA's cash collateral, ERA

demands adequate protection for any such use.

Dated:  June 29, 2016

Respectfully submitted,

**LeClairRyan, a Professional Corporation**

/s/ Daniel M. Eliades
Daniel M. Eliades, Esq.
(N.J.D.C. No. DME-6203)
LeClairRyan, a Professional Corporation
One Riverfront Plaza, 16th Floor
1037 Raymond Boulevard
Newark, New Jersey 07102
Telephone:  (973) 491-3600
Facsimile:   (973) 491-3555
Email:  daniel.eliades@leclairryan.com

*Attorneys for ERA Franchise Systems LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 29, 2016, I served by prepaid first class mail a copy of the foregoing Notice of Perfection of Security Interest in Property and Objection to Use of Cash Collateral on all parties against whom relief is sought and those otherwise entitled to service pursuant to Fed. R. Bankr. P. and these L.B.R. at the following addresses:

Lee M. Kutner
Kutner Brinen, P.C.
1660 Lincoln St., Ste. 1850
Denver, CO 80264

Paul Moss
Office of the U.S. Trustee
Byron G. Rogers Federal Building
1961 Stout St.
Ste. 12-200
Denver, CO 80294

/s/ Daniel M. Eliades
Daniel M. Eliades

# EXHIBIT A



**ERA FRANCHISE SYSTEMS LLC**
**REAL ESTATE FRANCHISE AGREEMENT**



**ERA**

### REAL ESTATE FRANCHISE AGREEMENT
### TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1.  PARTIES AND TERM | 1 |
| 2.  FRANCHISEE INFORMATION | 2 |
| 3.  INTERPRETATION | 3 |
| 4.  GRANT OF LICENSE | 3 |
| 5.  OFFICE LOCATIONS | 6 |
| 6.  SERVICES AND OBLIGATIONS TO FRANCHISEE | 7 |
| 7.  FRANCHISE ROYALTIES | 8 |
| 8.  BRAND MARKETING FUND | 10 |
| 9.  TECHNOLOGY | 11 |
| 10.  MANAGEMENT AND GOODWILL | 12 |
| 11.  OTHER COSTS AND OBLIGATIONS OF FRANCHISEE | 13 |
| 12.  FEE INCREASES | 14 |
| 13.  RECORDKEEPING; AUDIT | 15 |
| 14.  MODIFICATION OF THE SYSTEM; IMPROVEMENTS | 16 |
| 15.  OWNERSHIP CHANGES AND TRANSFERS OF THE FRANCHISE | 17 |
| 16.  EXPIRATION AND TERMINATION | 19 |
| 17.  INDEMNIFICATION AND INSURANCE | 23 |
| 18.  AMENDMENT | 24 |
| 19.  WAIVER | 24 |
| 20.  NON-COMPETITION COVENANTS | 25 |
| 21.  INDEPENDENT CONTRACTOR | 25 |
| 22.  MISCELLANEOUS | 26 |
| 23.  ADDITIONAL REPRESENTATIONS | 28 |
| 24.  STATE LAW ADDENDA | 28 |
| EXHIBIT A.  OWNERSHIP INTERESTS | 30 |
| EXHIBIT B.  GUARANTY OF PAYMENT AND PERFORMANCE | 31 |
| EXHIBIT C.  GLOSSARY OF TERMS | 33 |
| EXHIBIT D.  AUTHORIZED OFFICES | 36 |
| EXHIBIT E.  VOLUME INCENTIVE PLAN TABLE FOR 2013 | 37 |
| EXHIBIT F.  SECURITY AGREEMENT | 42 |
| EXHIBIT G.  STATE LAW ADDENDA | 43 |





**ERA**

Office I.D. No. 010155

**ERA FRANCHISE SYSTEMS LLC**
**REAL ESTATE FRANCHISE AGREEMENT**

**1.0    PARTIES AND TERM:**

**1.1    Franchisor.** The words "Franchisor," "we," or "us" mean:
ERA Franchise Systems LLC, a Delaware limited liability company, its successors and assigns.

By: _____ Date: _____2/25_____, 201Y
                                        (the "Effective Date")

Andrew G. Napurano
CAO & CFO, Realogy Franchise Group

**1.2    Franchisee.** The words "Franchisee," or "you" mean:

LBH National Corporation
(State of Organization: California)

By: _____ Date: _____, 20__
Print Name: Roger A. Herman
Print Title: Authorized Person

**EACH PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS THAT HE OR SHE IS AUTHORIZED TO BIND THE RESPECTIVE PARTY TO THIS AGREEMENT. THIS AGREEMENT IS NOT BINDING OR ENFORCEABLE UNTIL WE SIGN IT.**

**1.3    Owners.** The word "Owner(s)" means a sole proprietor or each Person who has a direct or indirect equity ownership interest in Franchisee (if Franchisee is an entity).

**1.3.1** You represent and warrant that Exhibit A accurately reflects all ownership interests in Franchisee, including all Owners and their ownership shares. a

**1.3.2** If any Owner is an entity, information about the Persons owning the entity and their ownership interests appears in Exhibit A.

**1.4    Guaranty.** You will cause the Owners (and if applicable, their members, shareholders and partners) to sign the Guaranty of Payment and Performance of your obligations attached as Exhibit B.

**1.5    Term of Agreement.** The "Term" starts on the Opening Date and expires **10** years after the Opening Date (the "Expiration Date"). For additional approved offices opened after the Effective Date, you must sign a Branch Office Location Addendum that will extend the Term for **10** years from the Branch Office's Opening Date, and this Agreement will govern the operation of the Branch Office(s).



ERA EXHC 03/13                                        - 1 -





**ERA**

**1.6    Initial Franchise Fee:**

1.6.1    The initial franchise fee for the first ERA office you open is $25,000.

1.6.2    The initial franchise fee for additional offices is $7,500 per office. We may increase this fee for any Offices you open after the Effective Date, consistent with the fee charged for branch offices in our then-current Disclosure Document.

1.6.3    YOU WILL PAY THE INITIAL FRANCHISE FEE WHEN YOU SIGN THIS AGREEMENT OR A BRANCH OFFICE LOCATION ADDENDUM FOR A FUTURE BRANCH OFFICE, AS APPLICABLE. THE INITIAL FRANCHISE FEE IS NOT REFUNDABLE; IT IS FULLY EARNED ON THE DATE WE SIGN THIS AGREEMENT OR A BRANCH OFFICE LOCATION ADDENDUM, AS APPLICABLE.

**1.7    Opening Date.** You will begin operating the Business at the Office using the System on <u>February 25, 2014</u> (the "Opening Date"). You will pay all fees due under this Agreement for all closings that occur on and after the Opening Date. Failure to begin operation using the Marks and System on the Opening Date is a material breach of this Agreement. If you operate the Office using the Marks before the Opening Date, in addition to our other remedies, you must pay all fees under in this Agreement from the date you begin operating the Office using the Marks.

**1.8    Security Agreement.** You will sign the Security Agreement attached as Exhibit F.

**2.0    FRANCHISEE INFORMATION:**

**2.1    Business Name.** You must operate the Business solely under the trade name "<u>Shorewood Realtors ERA Powered</u>", or "<u>Shorewood Realtors ERA</u>" ("Trade Name") and must use no other name in connection with any advertising or operation of the Business. Any display of the Marks or use of the System must comply with the P&P Manual. We have the right to review and require changes to any display of your Trade Name or our Marks.

2.1.1    You must file and maintain in the county and/or state where your Office is located and/or any other place legally required, a "Fictitious Name Certificate," or comparable filing. Before opening an Office, you must supply evidence that you comply with laws for the use of fictitious or assumed names. You may not change your legal entity or Trade Name without our prior written consent.

2.1.2    You must use your Trade Name and the Marks exclusively for the purpose of promoting and operating the Business, and for such other lawful business activities as we may authorize in writing, but we are not required to authorize any additional business activities.

**2.2    Legal Entity.** If you are an entity, you represent and warrant that you were duly formed and are in good standing under applicable laws. You will not include "ERA" in your legal name.

**2.3    Responsible Broker.** You will not operate without a Responsible Broker, who must have a license in good standing within the state(s) where you operate. You must provide written notice to us upon any change in your Responsible Broker.

**2.4    Notice Address.** All notices required under this Agreement must be in writing addressed to the respective parties at the addresses designated below and will be deemed given: (i) if personally delivered to



ERA EXHC 03/13                                      - 2 -



the respective party, on the date delivered, (ii) if sent in the United States mail, by certified mail, postage prepaid, 3 business days after it is sent (iii) if delivered by courier or express delivery service, on the date 2 days after it is sent, or (iv) if sent electronically, on the date delivered, to the authorized e-mail address of the receiving party. You may change your notice address by giving written notice as provided in this Section.

2.4.1    All notices to you will be sent to the Main Office address and/or to your primary e-mail address listed in our electronic reporting system (currently CREST). Electronic notices under subsection 2.4(iv) will not include notices sent under Section 16 of this Agreement, unless you request this method of delivery in writing.

2.4.2    Unless otherwise provided in the P&P Manual, notices to us will be sent to:

ERA Franchise Systems LLC
Attention:  Vice President, Franchise Operations
175 Park Avenue
Madison, New Jersey 07940
eralegalnotice@era.com

2.5      We may communicate with you, either by telephone or electronic means, about various matters including communications that might otherwise be prohibited by "do not call," "do not fax" or similar laws. You consent to these communications without the need for any additional consent.

3.0      **INTERPRETATION:**

**Definitions.**  Certain capitalized terms used in this Agreement are defined in Exhibit C, the Glossary of Terms (which is incorporated into this Agreement), or otherwise in the Agreement.

4.0      **GRANT OF LICENSE:**

4.1      **License.**  As of the Opening Date, we grant you a nonexclusive license to use the Marks and the System for the Business.  In accepting the nonexclusive license, you agree to comply with this Agreement, the P&P Manual and all mandatory specifications or standards as we may prescribe in writing from time to time.

4.2      **Excluded Businesses.**

4.2.1    If we consent in writing to your operation of an Excluded Business, you will be permitted to operate the Excluded Business, and no fees will be payable with respect to the gross revenue generated by the Excluded Business, if you satisfy the following conditions:

(i)  You will not use or mention, directly or indirectly, our name, Marks or System in connection with the Excluded Business.

(ii)  You must take all actions to ensure that the Excluded Business operations are conducted independently of your Business and our System and will not be conducted in any way that could reasonably cause confusion among the public as to whether the Excluded Business is operated under our name, Marks or System.  You must use a completely different business name for the Excluded Business; you may not use the Trade Name or any other business name similar to the Trade Name (or that may reasonably be deemed to cause confusion among consumers as to the relationship between the Excluded Business and the Business or as to the source of the goods or



ERA EXHC 03/13                                - 3 -



services provided) for the Excluded Business.  You must operate the Excluded Business using separate signage, telephone and facsimile numbers and website URL addresses, and different stationery, business cards, and related documents for the Excluded Business.

(iii)  You must maintain separate books and records for the Excluded Business.

(iv)  You may operate the Excluded Business from the Business's location if you take all steps necessary to conduct the Excluded Business in a way that avoids confusion among the public as to whether such Excluded Business is operated under the Marks (to be determined in our sole discretion), which steps include the segregation of personnel, workspaces and installation of separate interior and exterior signage for the Excluded Business, and may include the creation of separate entrances at the location.  On your Business website, you will not promote or identify any Excluded Business (except through a hyperlink to a separate URL that does not identify the Excluded Business's trade name).  Similarly, on the Excluded Business website, you (or your Related Parties) will not promote the Business (other than through a hyperlink to a separate URL).  We may impose other reasonable requirements on you to advise consumers that the operations and websites of the Business and Excluded Business are independent of one another.

(v)  You may not create or publish any cooperative advertising for the Excluded Business and your Office(s).  You may not mention our name, Marks, System or your Office and/or any relationship between the Excluded Business and your Office in any advertising or promotional material.

(vi)  Other than the Excluded Business, you will not engage in any aspect of the real estate brokerage business or any other related business, or in any way compete with your Office.

4.2.2    We have the right to audit or review the Excluded Business's financial records upon reasonable belief you are diverting revenues qualifying as Gross Revenue to the Excluded Business, or are otherwise in violation of this Agreement.  Notwithstanding the terms of this Section, all revenues, commissions, referral fees and/or other monies the Excluded Business pays or transfers to you will be Gross Revenue and subject to fees under this Agreement.

4.2.3    If any Excluded Business is conducted using the Marks or System in any way or does not meet any conditions we may impose, in addition to any other rights and remedies, revenue received from such products or services will be Gross Revenue and subject to fees under this Agreement.

4.3    **Program Expansion and Modification.**  We may modify existing programs and introduce new programs.  We reserve the right to offer, add to, qualify, or eliminate programs as we deem necessary in the best interests of the System.

4.4    **Participation in Programs.**  We may condition participation in our programs on compliance with this Agreement and certain other requirements as described in the P&P Manual.





**ERA**

**4.5    Identification and Use of Marks.**

4.5.1    The Marks, System and other products and items we deliver to you under this Agreement (collectively, the "System Components") are our exclusive property, and your right to use them is contingent on your full and timely performance under this Agreement. You will be responsible for and must supervise your Related Parties (and sales agents and employees) to ensure the proper use of the System Components and compliance with this Agreement. You acquire no rights in the System Components, except for your right to use them under this Agreement. You will not contest our sole and exclusive rights in the System Components. You will not claim any interest in the System Components that is contrary to this Section or at any time dispute the validity of the Marks and/or the System. You will not adopt, use, or seek to register any names, marks, insignias, colors, trade dress, or symbols that are confusingly similar to the Marks or do not comply with the Standards. You will cooperate with and assist us in any legal action brought by or against us regarding the System Components; you will not be required to incur any unreasonable costs in connection with your cooperation in such legal action.

4.5.2    We reserve the right to approve your use of the Marks, except for your use of any advertising templates that we may approve and update on a periodic basis. We may determine if you are meeting the Standards for the Marks' usage and you will promptly correct any deficiencies. All use of the Marks and the System inures to our benefit. At our sole option, we or our Related Party will obtain and maintain the Marks' registrations and exercise rights against unauthorized use of the Marks. You will use the Marks only in connection with the Business.

4.5.3    All advertising and promotions shall: i) be presented in a professional and dignified manner; ii) be completely accurate and truthful; iii) conform to all applicable laws and regulations relating to consumer advertising; and iv) give notice that your business is an independently owned and operated franchise.

**4.6    Office Appearance.** We may require you to make reasonable changes or upgrades to the office space where the Business is operated. You must maintain all Office facilities, equipment, office sign(s), yard signs, stationery goods, and all other items in first-class condition and in compliance with the P&P Manual.

**4.7    Office Sign.** You will install one or more internally lighted exterior signs displaying your Trade Name. Your sign(s) must conform to the P&P Manual and MUST BE APPROVED BY US IN WRITING IN ADVANCE AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, AND OVERALL APPEARANCE. You must obtain our prior written approval for any exception to Office sign requirements due to local ordinances or other reasons.

**4.8    Yard Signs.** You will purchase or lease from our Approved Supplier or other vendor an adequate quantity of yard signs displaying your Trade Name and any other information required by law and complying with the standards and specification in the P&P Manual and Identity Standards Manual. Within 60 days after the Effective Date, you will provide either color photographs of the signs or a copy of the order for the signs.

**4.9    Business Hours.** You will continuously conduct the Business at the Office, which must be open during regular business hours at least 6 days per week.

**4.10    Disclaimer.** You will place a conspicuous notice on or near the front entrance of the Office that clearly states: "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" or any modification of this statement as we may require in the P&P Manual (the "Disclaimer"). You must include the Disclaimer





**ERA**

on all signage, business cards, stationery, promotional and advertising materials, website and internet communications, real estate documents, and all other materials you use.

**4.11    Confidentiality.**  You will not disclose and will treat as confidential all of the Confidential Information you have now or in the future regarding the System.  You will not, directly or indirectly, engage or aid in the misappropriation, disclosure, divulgence or distribution of any Confidential Information.  You will use System Components solely in connection with the operation of the Business and will not direct or permit their reproduction without our prior written consent.  You will require all of your management personnel, brokers and sales associates to treat Confidential Information as confidential.

**4.12    Internet and Domain Name.**  You may use the Internet to market your Business as set forth in the Standards. .  You, your employees, brokers, sales associates and representatives will not use, license or register any domain name or URL (or other means of identifying you or your Business on the Internet) that uses a mark, image or words confusingly similar to the Marks or any abbreviation, acronym, or phonetic or visual variation of a Mark without our prior written consent.  Your employees, sales associates and representatives are not licensed to (and are not permitted to, under any circumstances) register any domain name or URL (or other means of identifying their personal business on the Internet) that uses a Mark or any mark, image or words confusingly similar to a Mark or any abbreviation, acronym, phonetic or visual variation of a Mark.  At our request, you will promptly assign or redirect (or cause to be assigned or redirected to us) any domain name, URL, or other identification that violates this Agreement or the P&P Manual at your expense and without compensation from us.  The content you submit to us or use for any Internet marketing must be true, correct and accurate.  At our request, you will promptly modify any of your Internet marketing material containing the Marks to conform to the Standards.

**5.0    OFFICE LOCATIONS:**

**5.1    Office.**  You will operate the Business only from the Office(s) identified in Exhibit D, or any other Office authorized in a writing signed by you and us.  You will not operate any other business or engage in any other activity at or from the Office, except in compliance with this Agreement.

**5.2    Relocation of Office.**  You cannot relocate an Office (or announce the relocation of an Office) without our prior written consent. You must request our consent for any proposed relocation through the procedures described in the P&P Manual.

**5.3    No Exclusivity.**  The ERA franchise granted by this Agreement is non-exclusive and covers only the Office(s) described in Exhibit D and any other Branch Office Location Addenda executed after the Effective Date.  This Agreement does not grant you any market, territorial rights, or protected area.  This Agreement does not grant you any right to purchase additional franchises, or grant any right or priority for the location of additional franchises.  We and our Related Parties retain all rights and discretion with respect to the Marks, the System and other real estate offices, including the rights to:

**5.3.1**    Operate and grant others the right to operate ERA offices identified at locations within or outside the area where you operate, and on such terms as we deem appropriate;

**5.3.2**    Sell any products or services under the Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution; and





**ERA**

**5.3.3**   Operate and grant others the right to operate real estate offices identified by trademarks, service marks or trade dress other than the Marks, at locations within or outside the area where you operate, and on terms as we or any of our Related Parties deems appropriate.

**5.4   Future Branch Offices.**   If you seek to operate the Business from an additional office ("Future Branch Office") after the Effective Date, we must approve the Future Branch Office in a Branch Office Location Addendum signed by you and us.   To be eligible to open a Future Branch Office, you must be in compliance with this Agreement and any agreements with us or our Related Parties.   We have the right to accept or reject your application for a Future Branch Office.

**5.5   Special Offices.**   We may establish and modify the requirements for special categories of office locations (e.g., seasonal, satellite, Kiosk or Temporary Tract offices).   Conditions and restrictions for opening, operation and closing such special locations, including signage, permitted services, and fees, will be described in the P&P Manual or in separate agreements.   We will require you to sign an addendum to this Agreement for the operation of any special offices.

**6.0   SERVICES AND OBLIGATIONS TO FRANCHISEE:**

**6.1   Our Obligations.**   After the Opening Date, we will provide the services described in this section.

**6.1.1   Orientation Training.**   The "Orientation" is our training program to introduce the System to the Responsible Broker and other staff.   The Orientation will be held at times and places as we designate.

> **6.1.1.1** If the Office(s) covered by this Agreement are your first offices in the System, we will provide tuition, lodging (limited to 1 double room), continental breakfast, and lunch for 2 persons (for 1 person if this Agreement is for your second or subsequent Office) from your organization in a location we designate.   You and your Responsible Broker or another agreed upon individual ("Designee") will attend the first Orientation offered after the Opening Date at which space is available and pay all transportation and personal expenses to attend.   If you fail to attend the first Orientation offered after the Effective Date, you must pay the registration fee and all other expenses. Failure to attend the first Orientation offered is a material breach of this Agreement.   You must pay all Orientation costs and a delinquency fee if your Responsible Broker or Designee does not attend within 12 months of the Opening Date.

> **6.1.1.2** You must pay all costs incurred by the Responsible Broker or Designee in attending Orientation if you acquired the Office through a transfer.

> **6.1.1.3** Any new Responsible Broker must attend the first available Orientation after he or she becomes your Responsible Broker.   You will pay all costs for the new Responsible Broker's attendance at the Orientation.

> **6.1.1.4** The failure of your Responsible Broker or Designee to attend the Orientation is a material breach of this Agreement.

**6.1.2   Optional Training Courses.**   We may make available to you optional training courses, seminars or conferences at times and places and for fees as we designate.   You must pay all course fees, travel and living expenses to attend optional training courses.





**6.1.3    Continuing Assistance.**  We will provide you with guidance on marketing and compliance with the System in the P&P Manual, bulletins and other written materials, consultations by telephone or in person at our facilities or the Office, or by other means of communication.  We may, at your request, provide special assistance for which you will be required to pay fees and expenses as we then charge.

**6.1.4    Optional Programs.**  We have the right to develop, implement, modify and/or discontinue optional programs to enhance the Business.

**6.2    International Business Conference.**  You or your representative will attend and encourage your sales associates and employees to attend our annual International Business Conference.  You must pay at least 1 registration fee for the International Business Conference, whether or not you or your representative attends.  We have the right to bill you at any time before the International Business Conference for 1 full-price registration fee, if we have received no registration from your Office at the time of billing.

**6.3    Services and Products.**  We have the right to introduce and make available real estate related services and products, including, but not limited to, those related to mortgage origination, insurance, home warranties, and communications systems.  We will give you written notice that a product or service is available for your use.  If we advise you through written notice that a product or service is an essential element of the Business, as we may determine, and accordingly must be utilized, you will, at your sole expense:  (i) obtain all necessary equipment, products or services which we advise you are necessary to use the product or service; and (ii) begin using such product or service within 90 days after your receipt of the written notice.  If you elect to utilize a non-essential element we make available, you will, at your sole expense, obtain all necessary equipment, products or services that we advise you are necessary for use of the product or service.   We have no obligation to introduce or make any new services or products available.

**6.4    No Implied Duties.**  This Section 6 describes our express obligations to you.  We assume no implied duties to you under this Agreement.    This Section 6.4 does not disclaim the representations of the Disclosure Document.

## 7.0    FRANCHISE ROYALTIES:

**7.1    Royalty Fee.**

**7.1.1**    Except as described in Section 7.1.2, you will pay us a continuing fee equal to 6% of your Gross Revenue during the Term (the "Royalty Fee").  For each real estate transaction that occurs on or after the Opening Date, including all transactions pending before the Opening Date, you must report the transaction and pay a Royalty Fee by ePay (or other method we designate) on the date of settlement (closing).  Royalty Fees are also due for all transactions and sales contracts entered into before the Expiration Date or the date this Agreement is terminated.

**7.1.2**    Royalty Fees are due and payable in U.S. currency.  In addition to Royalty Fees due on all third-party transactions, you will pay a Royalty Fee on personal real estate transactions involving you, your Owners and your Related Parties (whether or not a commission was paid on the transaction) ("Personal Transactions"), except that we will waive Royalty Fees on 3 Personal Transactions per calendar year if you (a) did not collect a commission or fee on the Personal Transaction, and (b) submit documentation that we may require to confirm eligibility for the waiver.  We will impute





**ERA**



your regularly charged brokerage commission or fee for any transactions on which you do not charge a commission, including transactions involving your sales associates or employees, and you will pay a Royalty Fee based on the imputed commission or fee.

**7.1.3**   You are not required to pay Royalty Fees on revenues received as a result of Property Management Services and Broker Price Opinions. However, if more than 25% of your total Annual Gross Revenue is derived from these services, you must pay Royalty Fees on all Gross Revenue attributable to these services. We may require you to submit a periodic report of your gross revenue derived from Property Management Services and Broker Price Opinions.

**7.1.4**   Each month, you must pay us the greater of the Royalty Fee due or $702 per Office (the "Minimum Monthly Royalty Fee"). If, at any time, your monthly Royalty Fees do not exceed the Minimum Monthly Royalty Fee, you must pay by the 10th day of the following calendar month the lesser of (i) the Minimum Monthly Royalty Fee; or (ii) the Minimum Monthly Royalty Fee less the Royalty Fee already paid. The Minimum Monthly Royalty Fee may be adjusted annually as described in Section 12.

**7.2**   **Volume Incentive Plan.** "Volume Incentive Plan Award" or "VIP Award" means a cash award we provide to you based on your achievement of certain levels of Gross Revenue and compliance with the operational criteria described in this Agreement and the P&P Manual. Each calendar year in which you operate the Business under the Marks for which your Gross Revenue is measured for VIP Award purposes is referred to as a "Calculation Year."

**7.2.1**   We may establish reasonable conditions to our obligation to pay VIP Award, including, without limitation, the following:

**7.2.1.1**   You, your Owners and Related Parties must be current with respect to all financial obligations owed to us and must be in full compliance with this Agreement, the P&P Manual, and all other agreements with us and our Related Parties;

**7.2.1.2**   You must achieve minimum levels of participation and performance in our various sponsored programs during the Calculation Year; and

**7.2.1.3**   You must have at least 15 months left before the Expiration Date.

**7.2.2**   The "Award Date" will be April 15th of the year following the Calculation Year for the VIP Award. On or before the Award Date, we will pay you a VIP Award for the Calculation Year in accordance with the VIP Award table in Exhibit E (subject to the terms of this Section 7.2).

**7.2.3**   Additional conditions for the VIP Award and all adjustments to the VIP Award will be described in the P&P Manual. We may increase or decrease the percentages and/or dollar amounts the VIP Award table, provided that adjustments may not exceed 20% of the percentages and/or dollar amounts then in effect.

**7.2.4**   We have the right to pay in advance of the Award Date any or all of the VIP Award for any Calculation Year. You must pay us any unearned portion of the advanced VIP Award immediately upon our request.





**ERA**

7.2.5    Gross Revenue for VIP Award purposes will exclude the following: (A) Gross Revenue for which you failed to pay Royalty Fees and Brand Marketing Fund contributions within forty-five (45) days of the transaction settlement date; and (B) Gross Revenue from any calendar quarter in which you received a notice of default under Section 16 or have not cured a previously noticed default (the entire calendar quarter of Gross Revenue will be excluded regardless of when the default is cured).

7.2.6    For purposes of this Section, Gross Revenue includes Gross Revenues for all offices operating under the System with identical equity ownership as you; provided that only one VIP Award will be payable to all offices.

**7.3    Continuing Obligation.**  You will pay us the full amount of Royalty Fees when due regardless of our obligations or payments of the VIP Award.

**8.0    BRAND MARKETING FUND:**

**8.1    Brand Marketing Fund Contribution.**  You will pay us each month during the Term by ePay (or other method we designate) a Brand Marketing Fund ("BMF") contribution equal to 2% of your Gross Revenue, subject to the terms of this Section.

**8.2    Minimum Monthly Contribution.**  For each Office, your monthly BMF contribution will be subject to minimum and maximum requirements.  As of April 2013, the minimum and maximum monthly contribution for your first Office is $379 and $1,322, respectively.  If you operate more than 1 Office, your maximum monthly BMF contribution for each Branch Office will equal $940.  Minimum and maximum monthly BMF contribution levels may be increased on multiple occasions under Section 12 of this Agreement.  If you open a Future Branch Office, the minimum and maximum monthly BMF contribution for each Future Branch Office will be set as published in our then-current Disclosure Document and will be contained in the Branch Office Location Addendum.

**8.3    Payment.**  You must pay the BMF contribution for each month by the 10th day of the following month.  If we determine the current required maximum and minimum BMF contributions are greater than required to effectively conduct the advertising, public relations and/or promotional campaigns, we have the right to reduce the maximum and minimum BMF contributions by the amount and period of time as we deem appropriate.  We have the right, with at least 30 days' notice to you, to restore the maximum and minimum BMF contributions.

**8.4    Use and Management of BMF.**

8.4.1    The BMF is not held in trust and we do not manage it in a fiduciary capacity.  The BMF is a contractually generated fund.  We may deposit BMF contributions with our other monies, but will separately and distinctly identify and account for BMF contributions on our books and records. We use the BMF for the development, implementation, production, placement, payment and costs of national and regional (as defined by us) advertising, marketing, promotions, public relations and/or other programs, including direct mail (and email), market research, customer surveys and test marketing to promote and further the recognition of the Marks, the System and franchisees generally.  The BMF may also be used for other purposes such as website development and maintenance for the brand consumer website and the System intranet site, training, customer service support, real estate listing enhancement costs and subsidies, listing distribution arrangements, regional and national ERA® system events and related activities, social media



ERA EXHC 03/13                                      - 10 -



**ERA**

development and training, awards, LeadRouter (or any similar or successor) leads management system development, maintenance and updates, customer loyalty programs, agent or broker productivity tools, system communications, identity standards and website compliance, brand extension development and marketing, agent recruiting initiatives, tools and marketing, software development and distribution and other related activities in support of the ERA® brand and the ERA® system. The BMF compensates us or our Related Parties for out-of-pocket costs on behalf of the BMF, for marketing staff compensation and a portion of our senior management compensation, and for reasonable expenses incurred for rent, overhead, accounting, collection, reporting, legal, human resources, finance, operations, management and other services (collectively "Corporate Services"), which we or our Related Parties provide to, or which relate to the services provided to, the BMF to support marketing activities. We and our Related Parties may provide certain products and/or services to the BMF, including the Corporate Services outlined above, which would otherwise be provided by third parties. Any products and/or services provided by us or our Related Parties will be provided at a cost comparable to those costs that the BMF would otherwise incur if the products or services were obtained from unaffiliated third parties.

8.4.2    We are not required to use or allocate BMF contributions on a proportional basis with the contributions collected from any geographic area or to benefit any particular franchisee or franchisees. We are not obligated to use BMF contributions in the year we receive them. If we spend less of the BMF in any calendar year than we collect, the excess contributions will be used in future years. The BMF may borrow from us or other lenders to cover its deficits or invest any of its surplus for future use. In the event that BMF contributions made by any of our Related Parties in any calendar year exceed the required amount, such Related Parties may be reimbursed for the excess contributions from amounts later contributed to the BMF or may use the excess as credit against future contributions.

8.4.3    On your written request, we will provide you a financial report of the BMF showing the total BMF contributions collected and disbursed for the previous year, certified to be true and correct by one of our authorized officers or by an independent certified public accountant. We are not required to cause the BMF to be audited or reviewed by an independent certified public accounting firm. The report is typically available after April 1st of the following year.

8.4.4    Except as provided in this Section, we assume no direct or indirect liability or obligation to you with respect to BMF's maintenance, direction or administration.

8.4.5    We will not be liable for any act or omission with respect to the BMF that is consistent with this Agreement or done in good faith.

**9.0    TECHNOLOGY:**

**9.1    Internet Reporting System.** You must use our Internet based reporting system to promptly report all listings, pending and closed transactions for which a Royalty Fee is, or may be, payable. The system consists of our proprietary software and non-proprietary operating programs that enables you to transmit required listing information, transaction information and other data. We will provide the software to you without charge. You must obtain appropriate connectivity and browser software for this application as well as any platform upgrades that may be necessary. You are responsible for purchasing compatible hardware from a vendor you select. The technology systems are not available for Apple®, Power PCs® or MacIntosh® hardware and are not compatible with OS2®, Unix®, or Linux operating systems.



ERA EXHC 03/13                                    - 11 -



**ERA**

**9.2     Required Computer Equipment.** The current minimum standards are listed in the P&P Manual. You must also maintain high-speed internet access for this computer equipment. You must upgrade, replace or add equipment at your cost as changes in technology require. We may require you to use an Approved Supplier of computer equipment to meet our specification standards. We do not currently have an Approved Supplier of computer equipment.

**9.3     Additional Technology Products.** We may charge a fee for additional technology products that we offer and that you may subscribe to and use at your discretion. Any fee will be consistent with the fee imposed on other franchisees for similar services.

**9.4     Systems Support.** Applications we develop are licensed and distributed on an "as is" basis. We will use our best efforts to provide support, limited solely to our issued applications. We reserve the right to change the level and type of support provided at any time without notice.

**9.5     Lead Management Application.** You may purchase, lease or enter into a license agreement with us, our Related Parties or an Approved Supplier for a lead management program that we designate to be used by your Office to manage leads obtained through our website or otherwise. If we modify the lead management program or require our franchisees to use a new program, you will be required to comply with any changes. You will use your best efforts to properly manage and service any leads provided to you through the lead management program and to train all personnel on the management of leads through the program.

**9.6     IDX Technology.** If permitted under law and/or the rules of the applicable Multiple Listing Services, at our request, you will provide us access to the Multiple Listing Services in which you are a member. You will cooperate with us and sign any documents required to provide us access to the listings in the Multiple Listing Service to display information as a direct electronic feed on our consumer website.

**9.7     Your Responsibilities.** You are responsible for the selection, purchase, installation, maintenance and support of all hardware and systems software required to run our technology products.

**9.8     Additional Programs.** You agree to purchase or participate in any additional programs that may require special licensing, software or other technology acquisitions or upgrades to improve the services, efficiency, and operation of your Business as we deem necessary.

**10.0     MANAGEMENT AND GOODWILL:**

**10.1     Management.** You and your Owners will actively manage and supervise the Business's operation.

**10.2     P&P Manual.** You must comply with the P&P Manual and supervise your brokers, sales associates, employees, Responsible Broker and Related Parties to ensure their compliance. We reserve the right to make reasonable changes in the P&P Manual that we determine are appropriate in our Reasonable Business Judgment for the continued success and development of the System and its franchisees. We may also modify the P&P Manual at any time to reflect changes in the System. At your own expense, you must adopt on a timely basis (but no later than 90 days after notice) any such modifications. We will notify you by email or regular mail as to material changes in the P&P Manual or other changes related to the Franchise. If there is any conflict, discrepancy or ambiguity between the terms of this Agreement and the P&P Manual, the terms of this Agreement will control. If a dispute arises over the P&P Manual contents, the master copy that we maintain at our principal office, or the most current edition maintained on our Intranet site, will control.



ERA EXHC 03/13                                    - 12 -



**10.3    Ethical Conduct, Consumer Relations and Protection of Goodwill.** You must give prompt, courteous and efficient service to the public and operate the Business in compliance with the P&P Manual and professional standards to preserve and enhance the value and goodwill of the Marks and the System. You will uphold, and take reasonable steps to ensure that your brokers, sales associates and employees uphold, high standards of honesty, integrity, fair dealing and ethical conduct in dealing with the general public, customers of the Business, other franchisees and us. All persons engaged in the Business must comply with the National Association of REALTORS® Code of Ethics. You hereby authorize any federal, state or local body regulating or supervising real estate practices to release to us information about complaints and disciplinary actions related to your (or your Related Parties') practices. You must maintain all required permits, certificates and licenses in good standing and in compliance with applicable laws and regulations. You must operate the Business in compliance with all municipal, county, state and federal laws, including all laws and regulations of the real estate commission or other licensing authority governing your operation. We and you acknowledge that disputes may arise between you, or your Related Parties or sales associates, and a client or other Person involved in a real estate transaction, and that it is in the best interest of all parties, when possible, to quickly resolve disputes. You must promptly respond to all complaints received from your clients or other individuals in an attempt to resolve the dispute in a reasonable business manner. If we: (i) are contacted by a complaining party or become aware of a complaint against you; (ii) make a reasonable finding that you, your Related Parties or sales associates acted in a materially improper fashion; and (iii) determine that the complaint was not resolved with the complaining party to our satisfaction within 30 days from our finding, we may terminate this Agreement on 30 days' written notice to you. You will not make or publish any statement or advertisement which would reasonably be expected to demean the image, value, identity, reputation or goodwill associated with our name or the Marks. This covenant is independent of and will survive any termination, expiration or Transfer of the Franchise.

**11.0    OTHER COSTS AND OBLIGATIONS OF FRANCHISEE:**

**11.1    Marketing Materials.** We will make materials available for purchase to promote your Business and our products, services, and programs.

**11.2    Payments and Interest.** Any payments more than 10 days past due will bear interest at the lesser of the highest rate allowed by law or 18% per annum (1.5% per month). We will apply your payments (and, at our discretion, any amounts we (or our Related Parties) owe you or your Related Parties) to any of your past due indebtedness for Royalty Fees, BMF contributions, purchases from us or our Related Parties, interest or other indebtedness as we may determine in our Reasonable Business Judgment. No restriction on any check or in any communications accompanying payment will bind us or our Related Parties. Our acceptance of any payment will not constitute an accord or satisfaction and will not be construed as a waiver of any breach of this Agreement. You may not withhold payment of any Royalty Fee, BMF contribution or any amount due based on alleged non-performance or breach of any of our or our Related Parties' obligations under this Agreement or any related agreement, including for the sale of products or services by us or our Related Parties to you.

**11.3    Payment Procedure.** You must pay amounts due to us using CREST ePay, a Web-based, self-service application for electronic payments. We may revise the required form of payment from time to time in the P&P Manual and you must comply with any changes.

**11.4    Offsets.** At our discretion, we may offset any amounts we owe you in full or partial satisfaction of any amounts you owe under this Agreement or other agreements between you and us or our Related Parties, whenever your payments are more than 30 days past due.





**11.5    Returned Checks.**  You must pay a returned check charge on any checks returned unpaid for any reason.  We may charge you the highest commercial rate allowed by law.  You must replace any such check with a certified or cashier's check, money order or electronic transfer of funds within three (3) days of notification.

**11.6    Net Worth.**  You acknowledge that a material consideration for us in granting this Franchise is your representation that you and your Owner(s) are financially responsible and have both (A) a net worth in tangible assets in excess of $150,000, not including (i) the value of any interest in this Agreement (or notes provided to you from us or our Related Parties in conjunction with this agreement) or (ii) any of your working capital (defined as total current assets less total current liabilities, all prepared in accordance with generally accepted accounting principles); and (B) liquid assets (cash or securities that can be easily converted into cash) of at least $75,000.  You agree and warrant that you and your Owners will maintain the minimum net worth requirement throughout the Term.  You further agree that maintaining these requirements and remaining in financial good standing with us and your third party creditors is critical to the protection of our goodwill and the Marks.  If the net worth requirement is not maintained at any time, you must procure a guarantor acceptable to us to the extent of the deficiency, which guarantor will guarantee your performance under this Agreement.

**11.7    Listing and Pending Listing Inventory.**  You will provide, within 15 days of the Opening Date, and thereafter maintain with us, a complete and current inventory of all listings, pending or otherwise, of your Business, in our required format.  You consent to our use of your listing and transaction information.  For any pictures or other media you supply to us (including those used in listings on our website), if you own the copyright of any such picture or other media, you grant us a fully paid up and royalty free license and right to use and sublicense.  You agree to indemnify and hold us harmless against any third party claims that our use infringes such third party's rights.

## 12.0    FEE INCREASES:

**12.1    Annual Increases.**  On April 1st each year, we have the right to increase the Minimum Monthly Royalty Fee and the minimum and maximum BMF contributions.  No percentage increase in fee will exceed the greater of (i) the percentage increase of the Consumer Price Index for all Urban Consumers, U.S. City Average (1967=100) ("CPI") during the period between November of the applicable base year of such particular fee and the November immediately before the date of the proposed fee increase, plus 3%, (ii) the yield to maturity on United States Treasury Bonds (as listed in The Wall Street Journal or such other source as we deem reliable) maturing approximately 10 years after November 1st in the year before the date of the proposed fee increase, plus 3%, or (iii) the U.S. Average Existing Single Family Home Sales Price annual increase, not seasonally adjusted, yearly percent change, as quoted in the July National Association of Realtors® Press release or any other nationally recognized source of housing price data, plus 3%.  We may round to the nearest dollar the amount of any fee increase.  Each fee's applicable base year is defined for CPI purposes as the calendar year immediately before the year in which we last raised the fee.  Any fee increase (e.g., minimum BMF contribution) does not change the applicable base year for any other fee not increased at that time.

**12.2    Other Fee Increases.**  Except for the fees described in Section 12.1 and the Royalty Fee (which is not subject to increase), we have the right to impose, eliminate or modify training fees, fees to participate in voluntary programs, or administrative fees, including, but not limited to, referral fees, late charges, returned check charges, cancelled audit and access fees, which revisions are not subject to the limitations of Section 12.1.





**ERA**



**13.0   RECORDKEEPING; AUDIT:**

**13.1   Recordkeeping, Financial Statements and Audit.**

**13.1.1  Recordkeeping.**  During the Term and for three (3) years after the expiration or termination of the Term, you must maintain accurate records in the form we require.  You must transmit information to us in the manner and format we require.

**13.1.2  Financial Statements.**  You will provide us with a detailed profit and loss statement within 60 days after each calendar quarter (or as often as we designate in the P&P Manual).  You will submit any additional information we require in the P&P Manual.  You will also supply a complete financial statement and a copy of your federal tax return, on an annual basis within 120 days of your fiscal year-end.  You, your authorized officer, or a general partner, if applicable, or your independent accountant will sign the financial statement certifying its truth and accuracy.  Financial statements must be prepared in accordance with generally accepted accounting principles.

**13.1.3  Audit.**  You must allow us or our designee(s) to audit your operations, including your financial record retention systems, or to obtain information from other sources, including the local Multiple Listing Service, to verify Royalty Fees, BMF contributions and other fees due to us.  You must immediately pay us any fees that the audit reveals were due during the audit period but not paid.  If the audit exposes a deficiency of 5% or more in amounts due for any three month period, you must also pay all of our audit costs and the deficiency will constitute a material breach of this Agreement.  You must dispute any audit findings in writing and identify the basis for any dispute in accordance with the P&P Manual and Section 13.7.  We may also impose audit costs on you if you fail to cooperate with an audit.  We may charge you an administrative fee, up to $500 currently, if you cancel or reschedule an audit.

**13.2   Access to Records.**  We, or our designee, have the right during the Term and for three (3) years following termination of the Agreement, to visit your Office (or such other place where your records are located) during normal business hours and without hindrance or delay, proceed:

**13.2.1**  to inspect, audit, check and make copies of your books, records (including state and federal tax returns), journals, orders, receipts, any correspondence and other data relating to your Business or to any transactions, including the books and records of any Related Party or Excluded Business if we have reason to believe that (i) its funds were commingled with the Business; (ii) it was operated in violation of Section 4.2; or (iii) the Marks were used in connection with the Related Party's business;

**13.2.2**  to verify any portion of your records or your Business or any Excluded Business as we may deem reasonable under the circumstances, including prompt response to any post-audit request for additional information; and

**13.2.3**  to discuss your records and the Business or any Excluded Business with any officers, directors and employees responsible for maintaining the records, or with your Responsible Broker or sales associates.

**13.3   Condition of Transfer of the Franchise.**  We have the right to audit your operations at any time, including as a condition of our approval of any Transfer of the Franchise.



ERA EXHC 03/13                                       - 15 -



**ERA**

**13.4    Sales Associate Information.**  You will provide us information about your sales associates and assist us in any survey of your sales associates.  Sales associate information will be updated promptly; all sales associate information will be current as of the end of each calendar quarter.

**13.5    Other Matters relating to Information.**  We expressly agree to keep confidential any financial statements you submit under the Agreement, provided that our confidentiality obligations do not extend to information that (a) is or becomes generally available to the public; (b) was in our possession before it was furnished; or (c) is or becomes available to us from a source that is not prohibited from disclosing such information by any confidentiality obligation.  This restriction shall not apply if we (or any of our Related Parties) are required under a court or government agency order or applicable law to disclose any non-public information we received.  Other than financial statements, no information supplied to us will be considered confidential.  We have the right to use any information you supply for our own business purposes, to disclose information as may be required by law and governmental authority, and to aggregate your information with other franchisee information and disclose aggregated information as we deem appropriate. You will provide us and/or cooperate with us in collecting other information as we may reasonably request, including information for research and development of services, products and programs, identification of demographic information, industry reports and preparation of our Disclosure Document.

**13.6    Cooperation.**  You must cooperate in scheduling any requested audit and providing access to records, which must be maintained and presented in reasonable order to allow the audit to be conducted in a reasonable time.  You acknowledge that all communications regarding the audit including, but not limited to, audit results may be communicated electronically unless you otherwise expressly indicate otherwise to the auditor.

**13.7    Waiver.**  Your failure, refusal or neglect to dispute any fees or contributions that an audit reveals you owe, including any fees, costs and penalties assessed in connection with an audit, constitutes a waiver of any right to challenge such fees, unless you provide us written notice of your dispute, along with an explanation of the basis for your dispute, within 90 days of the date we deliver the audit results to you in writing.

**14.0    MODIFICATION OF THE SYSTEM; IMPROVEMENTS:**

**14.1    Agreement to Accept Modifications.**  We have the right to change or add to the Marks or the System, including the adoption of new or modified trade names, trademarks, trade dress, service marks, copyrighted materials, new products or services, new equipment, new business methods or new techniques from time to time, without your consent.  We also reserve the right to modify, suspend or eliminate any new or existing portion of the System or the Marks.  Any changes related to the Marks or System will be communicated to you and reflected in the P&P Manual.  You will accept, use and display any changes in the System and will make such expenditures as may be required to implement the changes.

**14.2    Improvements by You.**  If you conceive or develop any improvements or additions to the System, new trade names, trademarks, service marks or other commercial symbols related to the Business or any advertising or promotion ideas related to the Business ("Improvements"), you will fully disclose the Improvements to us and obtain our written approval prior to use.  Any Improvements we approve will be deemed licensed to us on a royalty-free, paid-up, perpetual worldwide license, and may be used by us and our franchisees without paying you royalties or similar fees.  We also have the right to make application for and own copyrights, trade names, trademarks and service marks relating to any Improvements.  We may also consider the Improvements as our property and trade secret.  We will authorize you to utilize any Improvements authorized generally for use by other franchisees.



ERA EXHC 03/13                                   - 16 -



**ERA**

**15.0   OWNERSHIP CHANGES AND TRANSFERS OF THE FRANCHISE:**

**15.1   Ownership Changes.**  We must first approve in writing any proposed ownership change to transfer 5% or more of the Franchisee ownership rights.  If you propose to transfer less than 5% of Franchisee ownership rights, you must report the transfer to us at least 20 days in advance, and it will not be subject to our approval if all prior transactions under this Section combined do not result in the transfer of at least 5% or of the ownership rights in Franchisee.  If you are a partnership, a corporation, or a limited liability company, which is owned in whole or part by another entity, this Section will apply to the Owner entities as well.

**15.2   No Assignment.**  You acknowledge that your rights and obligations under this Agreement are personal to you and that we have granted this franchise in reliance on many factors, including your (and your Owners') character, skill, knowledge, business and financial capacity.  Accordingly, you may not assign your rights or delegate your duties under this Agreement, including the terms of any Addendum to this Agreement, except as permitted by this Agreement or as required by law.

**15.3   Limited Assignment Right for Sole Proprietorships or Partnerships.**  If you are a sole proprietorship or partnership, we expressly consent to the assignment of this Agreement, without payment of a fee, to an entity owned and controlled by the same Owners, provided that the Owners execute an assignment agreement and guaranty of the assignee's obligations to us.  You must notify us in writing of any proposed assignment under this Section and must provide and/or sign all documents we request including, but not limited to, assignment documents, Articles of Incorporation or Organization and Bylaws.

**15.4   Transfer of the Franchise – Definition.**  "Transfer of the Franchise" shall mean any transaction or series of transactions that results in:  (i) the sale or transfer of substantially all of the Business's assets, (ii) the majority Owner(s) before the transaction(s) holding less than 51% equity interest in you or the Business's assets, (iii) another entity becoming a franchisee, or (iv) the Owner(s) no longer controlling or managing the Business.  The Transfer of the Franchise may include transfers resulting from a divorce, death, insolvency, dissolution, declaration of or transfer in trust, or a foreclosure on the Business assets.  If any Owners are entities, a Transfer of the Franchise will be deemed to occur if such Owner entity experiences any of these events or transactions.

**15.5   Prohibited Assignments or Transfers of the Franchise.**  You may not complete a Transfer of the Franchise without our prior written approval, which will be subject to our Reasonable Business Judgment; failure to obtain our approval will be a material breach of this Agreement.  Any attempted Transfer of the Franchise not expressly permitted by this Agreement or approved by us will be null and void, and you will remain liable for all obligations under this Agreement.  After a Transfer of the Franchise, you will be liable for events that occurred before the Transfer of the Franchise and for all obligations that survive termination of this Agreement, including your indemnification obligations for any claims arising before the Transfer of the Franchise.  If you complete a Transfer of the Franchise in violation of this Section, you agree that our continued performance of our obligations, and the acceptance of any amounts due under this Agreement, does not waive our rights.

**15.6   Approval of Transfer of the Franchise; Prerequisites.**  You must provide us 30 business days' advance written notice of any proposed Transfer of the Franchise to a new franchisee ("New Franchisee").  The New Franchisee must submit any documents we reasonably require to approve the Transfer of the Franchise. Our approval will be based on various factors that include: (i) our review of a New Franchisee's franchise application (and supporting documents), (ii) any New Franchisee's or prospective owner's business experience, character, reputation and financial condition (including our



**ERA**

review of credit checks and financial statements), (iii) our review of the proposed transfer documents and/or any new entity organizational documents, (iv) unless prohibited by law, the New Franchisee's execution of the then-current form of franchise agreement and new Owners' execution of the then-current form of guaranty, (v) payment and/or assumption of any outstanding indebtedness you owe us, (vi) payment of a $5,000 transfer fee, (vii) execution by you and any departing Owners of a release of all claims against us and our Related Parties, (viii) an audit of your operations, and (ix) your purchase of tail coverage on errors and omissions and general liability insurance policies naming us as an additional insured.  In connection with any proposed Transfer of the Franchise, we may also consider the financial impact that a Transfer of the Franchise to an existing franchisee may have on us, including a potential increase in a VIP Award or decrease in the net effective Royalty Fee rate paid to us.  We may require adjustments to the Agreement to account for or eliminate any financial impact to us as a condition of our approval.

**15.7     Right of First Refusal.**  If you and/or any of your Owners intend to Transfer the Franchise for valuable consideration, you and/or such Owner must obtain a bona fide, signed, written offer from the potential purchaser and must deliver immediately to us a complete and accurate copy of the offer.  If the offeror proposes to buy any other tangible or intangible assets that do not relate to or are not used by or in the Business, the proposal for such assets or rights must be described in a separate offer that is disclosed to us, but to which this right of first refusal is not applicable.   The purchase price and terms for the Transfer of the Franchise will reflect the bona fide offered price and not reflect any value for any other assets.

**15.7.1**   Within thirty (30) days after you deliver a complete and accurate copy of the offer to us, we or our designee will have the option exercisable by written notice to you, to purchase the interest that is the subject of the offer, for the price and on the terms and conditions contained in the offer, provided, however, that (a) we may substitute cash for any in-kind payment proposed in the offer, (b) our credit will be deemed equal to the proposed purchaser's credit, and (c) we will have not more than 120 days from the option exercise date to consummate the transaction.  You will promptly respond to all our reasonable due diligence requests.  Terms and conditions for the purchase will be as similar as practicable to the offer's terms and conditions subject to the exceptions above.

**15.7.2**   Unless expressly limited in the third party offer, we have the right to purchase the interest subject to all customary representations and warranties, closing documents, releases and indemnities as we reasonably may require, including representations and warranties as to the ownership and condition of, and title to, shares of ownership and/or assets, the validity and status of contracts and leases and the extent of any liabilities, contingent or otherwise.  We also will have the option to acquire from you, for nominal consideration, an assignment of your leasehold rights for the Office premises.

**15.7.3**   If we do not exercise our purchase option, you or your Owners may complete the sale to the offeror on the offer's exact terms, subject to our approval of the Transfer of the Franchise, provided that if there is a material change in the offer's terms, we will have an additional option to purchase during the 30-day period after your notice to us of a material change in the offer's terms.

**15.7.4**   If the proposed Transfer of the Franchise is not supported by valuable consideration (e.g. gift, testamentary transfer or reorganization of your entity without any change in the Owners), we have no right of first refusal.

**15.8     Orientation Training for New Franchisee.**  The New Franchisee must attend the Orientation Training seminar for new franchisees required under Section 6.





**15.9     Assignment by us.** We may assign, transfer, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third-party beneficiary of any of our contracts with third parties, including vendors or other franchisees. We will have no obligations to you after you are notified that a transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**16.0     EXPIRATION AND TERMINATION:**

**16.1     Non-Renewability of Agreement.** NEITHER PARTY HAS RENEWAL RIGHTS. The tender or acceptance of your payments after expiration of this Agreement will neither prejudice our rights to enforce the expiration or your obligations on expiration, nor create any additional rights in your favor under this Agreement.

**16.1.1     Transition.** If there is an early termination of this Agreement by us under Section 15, to facilitate an orderly and efficient transition and preserve the goodwill associated with the System and the Marks on termination, you agree that we have the right to contact and communicate personally with any or all of your sales associates immediately after notice of termination has been delivered to you to solicit and/or discuss with them their options.

**16.1.2     Holding Over.** If you continue to use the Marks after the expiration of this Agreement, you will be deemed to be operating on a month-to-month basis ("Holdover Period") under the terms and conditions of the then-current franchise agreement being offered to prospective franchisees. During any Holdover Period, all of your obligations will remain in full force and effect, as if this Agreement had not expired, and all obligations and restrictions imposed on you upon expiration of this Agreement will be deemed to take effect upon termination of the Holdover Period. Notwithstanding, during any Holdover Period, you will be considered in default of your Franchise Agreement and subject to all remedies we have available to us up to and including termination.

**16.2     Termination.** This Agreement may be terminated only under terms and conditions established in this Section.

**16.2.1     Mutual Consent.** By mutual consent of the parties;

**16.2.2     Termination by us for Good Cause.** By us for good cause means your material breach of any obligations under this Agreement as we may determine in our Reasonable Business Judgment as stated in this Agreement. Good cause includes both curable and non-curable defaults and the failure to meet the Minimum Office Design and Appearance Standards or Minimum Operating Standards.

**16.2.3     Curable Defaults; Notice.** After giving you written notice and 30 days to cure identified defaults (except for cure periods established elsewhere in this Agreement and any longer periods required by applicable state's law), we may terminate this Agreement for the following uncured defaults:

**16.2.3.1** Your failure to timely and consistently report transactions or to pay when due any financial obligation to us, to the applicable Broker Council, or to the BMF;

**16.2.3.2** Your underreporting and/or underpayment of at least 5% of Royalty Fees and/or BMF contributions within any three-month period, or your refusal to permit us to audit your operations and records, or your failure to reasonably cooperate with an audit;



ERA EXHC 03/13                           - 19 -



**ERA**

16.2.3.3 Your Transfer of the Franchise without our prior approval or on the death, judicial determination of incompetence, or the appointment of a conservator or guardian over you or an Owner, the failure to seek our written approval for Transfer of the Franchise within 180 days after such event;

16.2.3.4 Your attempt to subfranchise, license or grant to any other person or entity the right to use the Marks or the System licensed to you under this Agreement;

16.2.3.5 Your failure to comply with all applicable municipal, county, state or federal laws;

16.2.3.6 The operation of any other business within the Office, except as permitted under this Agreement;

16.2.3.7 Your failure to properly display and use our Marks as described in the P&P Manual;

16.2.3.8 The creation of a security interest in this Agreement or the assets of the Business without our prior written consent; or

16.2.3.9 Any other material breach of this Agreement not listed above or those listed below as a noncurable default.

16.2.4 **Noncurable Defaults; No Notice Required.** We may terminate this Agreement immediately without prior notice or an opportunity to cure, if any of the following defaults occurs:

16.2.4.1 Suspension or revocation of your Responsible Broker's license, unless you timely appoint a substitute Responsible Broker as permitted under applicable law and such suspension or revocation does not otherwise breach this Agreement;

16.2.4.2 Any conduct that impairs the image, identity, value or goodwill associated with the Marks or the System;

16.2.4.3 The filing or imposition of any bankruptcy, receivership, composition, assignment, marshaling, insolvency or similar proceeding for the benefit of creditors related to you or your assets, provided that termination on bankruptcy may not be enforceable under the Bankruptcy Code;

16.2.4.4 Any default for which we have issued you a notice of default during the last 12 months advising you of our intent to terminate for the same cause, even if the default(s) were cured;

16.2.4.5 Any material misrepresentation or omission by you to us in the franchise application or otherwise with respect to acquiring the Franchise; or

16.2.4.6 The operation of a competing residential brokerage business in violation of the in-term non-competition covenant.

16.2.5 **Failure to Meet Minimum Office Design and Appearance Standards.** You acknowledge and recognize that all Offices must meet certain minimum standards of professionalism for size, interior design and decor, exterior attractiveness, general appearance and cleanliness. These standards are contained in the P&P Manual. If your Office fails to meet these standards, we will notify you in





writing and describe the deficiencies, and you will be given 90 days to correct them. If such deficiencies are not corrected to our satisfaction within 90 days, we have the right to terminate this Agreement.

**16.2.6   Failure to Meet Minimum Operating Standards.**   In the event your performance falls below the minimum operating standards ("Minimum Operating Standards") described in this Section 16.2.6, you will be notified in writing setting forth such deficiency and at our option you may be placed on probation for a period of not less than 6 months nor more than 12 months. If such deficiency is not corrected within said probationary period, we may at our option, terminate this Agreement. The Minimum Operating Standards require that you will, during every calendar year, beginning the second full calendar year after the Effective Date, close not less than 50 Residential Sales as defined below. A Residential Sales is defined as the closing of the sale of residential real estate for which you were the selling or listing broker, on which you were obligated to pay Royalties and BMF contributions under the terms of this Agreement. If you are the listing and selling broker for a Residential Sale, it will count as 2 Residential Sales for the purpose of the Minimum Operating Standards. You acknowledge that these Minimum Operating Standards may be modified or supplemented from time to time as published by us in the P&P Manual.

**16.2.7   Abandonment.**   With respect to the license for any individual Office, abandonment of your Office demonstrated by (i) the failure to commence operation as required under Section 1.7, (ii) removal of the Marks, or (iii) failure to operate the Business for 5 consecutive business days or any shorter period when, under the facts and circumstances, it would be reasonable for us to conclude that you do not intend to continue to operate the Business, unless the cause is a force majeure, e.g., flood, earthquake or similar acts of God.

**16.3   Our Pre-Termination Options.**   If you fail to pay any amount owed under this Agreement (subject to applicable notice and cure periods), or fail to comply with any term of this Agreement, in addition to our right to terminate this Agreement or to bring a claim for damages, we have the following options:

**16.3.1**   To suspend all services provided to you under this Agreement or otherwise, including training, marketing assistance, VIP and other award(s) eligibility for you and your sales associates, and the sale of products and supplies;

**16.3.2**   To suspend taking or placing referrals, leads, or relocation requests, Home Protection Plans and/or Sellers Security Plan applications, for or from you and to direct any inquiries regarding these or other programs or services to other franchisees;

**16.3.3**   To eliminate listing you in any advertising, marketing or promotional materials, including any directory listings approved or published by us and our principal website.

We may continue taking these actions until you comply with our requirements and we acknowledge your compliance in writing. The options in this Section will have no effect on, and will not release you from, any obligation you owe to us, our Related Parties, the applicable Broker Council or to the BMF. Your right to cure does not restrict our right to file any legal action before, during or after the cure period.

**16.4   Effect of Expiration or Termination.**   On expiration or termination, you must immediately, at your expense, return to us all of our property, including originals and copies of the P&P Manual, all copies of our technology products (including copies that your sales associates hold or control), and all films, DVDs, flash drives, materials and instruction manuals, electronic or otherwise, which are part of our programs. You must



ERA EXHC 03/13                                    - 21 -



**ERA**

also immediately discontinue all use of the Marks in all of your materials. You must immediately discontinue use of and destroy all signs displaying our unique style, logo, colors, color patterns and designs and/or Marks. Effective on the date of termination or expiration, you must refrain from any representation that you are our franchisee. You must de-identify your business from the System in a manner that does not confuse the public about the fact that you are no longer part of the System. You must (i) immediately advise all of your then-current clients that you are no longer associated with us; and (ii) immediately cause the local phone company (white pages), any business directory publisher and internet directories to remove you from their listings as our franchisee. You must immediately cause any Web masters or websites to remove our Marks from their Web pages, including social media websites. You must remove the Marks from your website(s) and social media sites and accounts that you or your sales associates control. You must remove our Marks from any source code or other mechanism that may direct a consumer searching for our Marks to your website. If your URL contains our Marks, you must either cancel such URL registrations for the Business or, at our option, assign your URL(s) to us. You must cause all sales associates to cancel all URLs containing our Marks that they may have established in violation of this Agreement.

**16.5    Effect of Continued Use of the Marks.** On expiration or termination, any continued use of the Marks by you, the Business or any of your sales associates: (i) will constitute willful and knowing infringement, dilution of our trademark rights and unfair competition; and (ii) may constitute trafficking in a counterfeit mark for which both civil remedies and criminal penalties may be imposed.

**16.6    Infringement Damages.** If we bring an action against you or anyone associated with you during or after the Term, seeking to halt infringement of the Marks, you acknowledge that any court of competent jurisdiction may enter temporary restraining orders or preliminary and permanent injunctions (under applicable law) without requiring a bond or other security and may order the immediate seizure and destruction of any infringing materials. If any court requires a bond, you agree that a $1,000 bond is sufficient. You must pay Royalty Fees and BMF contributions on all Gross Revenues during the period of any infringement, our attorneys' fees, costs and disbursements incurred in enforcing our trademark and contract rights. You agree that if you breach this Agreement and/or continue to utilize the System or Marks after termination or expiration, we will have no adequate remedy at law. Therefore, you expressly consent and agree that we may, in addition to other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent any threatened default or violation, by you of this Agreement.

**16.7    Surviving Obligations.**

16.7.1 Except as otherwise provided in this Agreement, on expiration or termination of the Agreement, you will have no further interest or rights in this Agreement. All financial obligations, incurred before termination or expiration, will not be affected by such termination or expiration and must be satisfied. as required under this Agreement. In addition, you remain obligated to pay Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the Franchise. The provisions of this Section survive termination or expiration of this Agreement.

16.7.2 If an "early termination" of this Agreement occurs (which will mean any termination of the Agreement before the Expiration Date, other than a mutual termination under Section 16.2.1), you will immediately pay us "liquidated damages." The parties agree that it would be impracticable or extremely difficult to calculate the actual amount you would have been obligated to pay as Royalty Fees, BMF contributions, and any other fees due under this Agreement, from the date of early termination through the Expiration Date and that the following method of calculation represents a





**E R A**

fair and reasonable estimate of our damages: Liquidated damages will be equal to the combined monthly average of Royalty Fees, BMF contributions, and any other fees under this Agreement (without regard to any fee waivers or fee reductions) payable from the Opening Date through the date of early termination, multiplied by the lesser of (i) 36 or (ii) the number of full months remaining in the Term. The present value of the total calculated at a discount rate of 8%, assuming payment at the end of each month, will be our liquidated damages.

16.7.3 We have the right to access and use (i) all information you provide to us as required by the P&P Manual, including, without limitation, any reporting items or categories that may later be adopted in the P&P Manual; (ii) all information you provide to us contained in your sales and transaction reports, and in such other operational reports that we request from you; and (iii) all information you provide to us regarding your customers' enrollment in any client contact program we may adopt. The information in (i), (ii) and (iii) above is referred to collectively as "the Client Information." We may use the Client Information for business purposes that may include, without limitation, public relations, advertising, statistical compilations, investigations and resolutions of client complaints, and quality surveys. IWe have the right, on termination, to continue to use the Client Information and to make the Client Information available to other franchisees for such purposes as we deem appropriate. On termination, you will be deemed to have assigned your client contact program enrollments to us to deal with the enrollments as we deem appropriate. On termination, your name and your sales associates' names will be removed from client contact program mailings.

**16.8     Other Damages.** Our right to collect reasonable attorneys' fees, costs of investigation, court costs and other litigation expenses incurred in enforcing our rights under this Agreement will survive termination.

## 17.0     INDEMNIFICATION AND INSURANCE:

**17.1     Your Indemnification.** You will indemnify and hold harmless us, our Related Parties, and all other franchisees from all expenses, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or related to the operation of the Business or an Excluded Business. If we are made a party to a lawsuit or other legal action or we have a claim asserted against us in connection with your (or your Related Parties') activities, regardless of whether you were named or served in the action, we may at our option, (i) tender the defense and/or prosecution of the case to you and you will be responsible for diligently pursuing the case at your expense; or (ii) hire counsel directly to protect our interests and bill you for all costs and attorneys' fees incurred, which bill you must promptly pay. This indemnity will apply to claims that we were negligent or failed to train, supervise or discipline you, and to claims that you, your Owners, employees, brokers or your sales associates are our agent or part of a common enterprise with us. The obligations under this Section survive the expiration or termination of this Agreement.

**17.2     Insurance.**

**17.2.1     Required Policies and Coverage.** You will obtain and maintain for the Term the following types of insurance: (1) automobile liability coverage, included hired and non owned auto's, with limits of at least $1,000,000 per occurrence; (2) general liability, including contractual liability, with limits of at least $1,000,000 per occurrence; (3) professional liability (real estate errors and omissions) coverage with limits of at least $1,000,000 per occurrence coverage; and (4) any additional types of policies and coverage as may be required by law, including, without limitation, workers compensation coverage. You must furnish us with certificates of insurance before the Opening Date. We reserve the right to require you to obtain additional types of insurance, to increase limits





during the Term or to reduce minimum coverage requirements, but you may carry reduced coverage only if you first receive our written approval to do so. Approval to do so may be revoked at any time. If you fail to maintain any required insurance, we may, but are not obligated to, obtain any and all required insurance on your behalf and to charge you for the cost. You will promptly reimburse us for all our costs upon demand.

17.2.2 **Carriers.** All policies must be in form and content satisfactory to us and must be issued by an insurer(s) rated A- or better in Class X by Alfred M. Best and Company Inc., or comparably rated by Moody's and/or Standard and Poor's or similarly reliable rating services acceptable to us. We reserve the right to change the minimum acceptable rating requirement.

17.2. **Additional Insureds.** We, Realogy Holdings Corp., and our respective subsidiaries, successors and assigns must be named as additional insureds on the insurance policies listed and maintained by you.

17.2.4 **Notice of Policy Changes or Cancellation.** All policies must provide that they may not be canceled except upon 30 days' advance written notice to us.

17.2.5 **Annual Certificates.** You must furnish us certificates of coverage and endorsements annually on or before the anniversary of the Opening Date.

**18.0    AMENDMENT:**

**18.1    Written and Signed.** Any modification of this Agreement must be in writing and signed by the authorized representatives of both parties.

**18.2    Authority to Amend.** NO FIELD REPRESENTATIVE, INCLUDING ANY DIVISIONAL OR REGIONAL OFFICER OR BUSINESS MANAGER OF OURS HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS TO THIS AGREEMENT. NO UNAUTHORIZED MODIFICATION WILL BE BINDING ON EITHER PARTY.

**19.0    WAIVER:**

**19.1    Waiver; Severability.** If any provision(s) of this Agreement is or becomes in violation of any local, state or federal law, such provision(s) will be considered immediately amended to conform to the law. If the violative provision cannot be amended to conform to law, each party expressly releases the other from any liability under the violative provision of this Agreement. To the extent any provision of this Agreement is deemed invalid or unenforceable for any reason, the remainder of this Agreement will not be adversely affected, but rather will be enforced to the greatest extent permitted by law. No waiver of any breach of this Agreement will constitute a waiver of any subsequent breach.

**19.2    Disputes with Others.** Each party waives the right to assert that principles of collateral estoppel or issue preclusion prevent raising any claim or defense because either party lost a similar claim or defense in another action. Any ruling by a third-party fact finder or court in a prior proceeding in which either party was involved (such party referred to as a "Litigant") with a third party will not prevent the Litigant from asserting similar arguments or positions in any action between the parties. .





**ERA**

**20.0    NON-COMPETITION COVENANTS:**

**20.1    In Term.**  During the Term, you Owners, officers, guarantors and Responsible Broker (for so long as each are engaged or employed by you) will not, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business, other than the Business or Excluded Business authorized under this Agreement.  Moreover, immediate family members of the Restricted Parties (as defined in Section 20.4) will not engage in any residential real estate brokerage business in the market you serve.

**20.2    On Transfer of the Franchise.**  Any New Franchisee must be protected against the potential for unfair competition by your use of our training, assistance and trade secrets in direct competition after a Transfer of the Franchise.  Therefore, for 24 months following a Transfer of the Franchise (or the remaining Term, whichever is less), you, your Owners, officers, guarantors, and the spouses of such Persons, will not, directly or indirectly, operate, own, license, franchise, be employed by or consult with any residential real estate brokerage within a 2-mile radius of any Office operating as of the date of Transfer.

**20.3    Competing Services or Products.**  During the Term, you, your Owners, officers, employees and sales associates will not manage, operate, hold any ownership interest in or receive compensation from any Person, that provides or seeks to provide equipment, supplies, services or other operating materials to our other franchisees, without our advance written consent.

**20.4    Post Term Restriction on Start-Ups.**  If on the Effective Date you were a Start-Up Company, you agree that you, your Owners, officers and guarantors, as well as any of the immediate family members of these Persons (collectively, the "Restricted Parties") will not, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business from any Office for a period of 1 year following termination or expiration of the Agreement.  A Start-Up Company is a real estate brokerage that operated a stand-alone licensed real estate business for less than 12 months before the Effective Date.

**21.0    INDEPENDENT CONTRACTOR:**

**21.1**    At all times, you will hold yourself and the Business out to be independently owned and operated.

**21.2**    You must conspicuously disclose in the Office, in your real estate sale documents, listing agreements and on all business cards, stationery, and in all advertisements and in all other printed or recorded material you and your sales associates and employees use, that you are independently owned and operated and are not our agent or owned by us.  You expressly understand that you will be an independent contractor and must hold yourself out to the general public as such.  This Agreement does not make you our agent, legal representative, joint venture, partner, employee or servant for any purpose.  You are not authorized to make or promise any contract, agreement, warranty or representation on our (or our Related Parties') behalf, or to create any obligation, express or implied on our behalf.  You are not authorized to accept service of process or legal notices directed to us.  You acknowledge that this Agreement does not constitute or create a fiduciary relationship, and the relationship between the parties is not, and is not intended to be a fiduciary relationship.

**21.3    Responsibility for Operations.**  We have no obligation to pay your commissions, taxes, wages or other expenses, and have no right to regulate or participate in the recruitment, engagement, retention, discipline or termination of sales associates or employees, or to determine or limit the parties from whom you accept listings, or for whom or to you may sell property, the commission rates you charge, your commission



ERA EXHC 03/13                                    - 25 -



splits with your sales associates, your working conditions, the manner or details of work performed by you or your sales associates or employees, except as may be necessary to protect the Marks and goodwill. You agree that you are solely responsible for the Business operated under this Agreement according to your own judgment, and in accordance with the provisions of this Agreement and the P&P Manual.

## 22.0    MISCELLANEOUS:

**22.1    Broker Councils.** You may support the concept of cooperative marketing activities with other franchisees in your area in order to derive more fully the benefits of local and regional identity and join and participate in local and regional Broker Councils when formed to serve the marketing area where your Office is located. In the event you elect to join a Broker Council, you will adopt and abide by Broker Council bylaws and the decisions of your Broker Council. We have the right to amend the Broker Council bylaws.

**22.2    Taxes.** You will pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by you in the conduct of the Business. If any fees (including, without limitation, Royalty Fees and the Initial Franchise Fee) payable by you to us are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction where you operate, you will, in addition to the fees due us, pay us an additional sum equal to the amount of such tax imposed on fees due us.

**22.3    Successors and Assigns.** Subject to Section 15, this Agreement will be binding on and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

**22.4    Headings.** The headings in this Agreement are for convenience only, do not constitute a part of this Agreement, and will not be deemed to limit or affect any of the provisions of this Agreement.

**22.5    Time of the Essence.** Time is of the essence for all of this Agreement's provisions that specify a time for performance.

**22.6    Applicable Law and Waiver.** Subject to our rights under federal trademark laws, the parties' rights under this Agreement, and the relationship between the parties is governed by, and will be interpreted in accordance with New Jersey laws (statutory and otherwise), except that the New Jersey Franchise Practices Act will not apply to agreements for Offices located outside New Jersey. You waive, to the fullest extent permitted by law, the rights and protections that might be provided through the laws of any state relating to franchises or business opportunities, other than those of the state in which the Office is located.

**22.7    Venue and Jurisdiction.** You submit to the non-exclusive personal jurisdiction of the New Jersey state and federal courts for any litigation arising out of or related to this Agreement or to any aspect of the business relationship between the parties. Such litigation will have venue in state courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

**22.8    Waiver of Class Action.** You agree that any judicial proceeding will be considered as to its facts and may not be brought as a class action. You and your Owners waive any right to proceed against us by way of class action.

**22.9    WAIVER OF JURY TRIAL. The parties waive the right to a jury trial in any action arising out of or related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns.**



ERA EXHC 03/13                              - 26 -



**ERA**

**22.10   Waiver of Punitive Damages.** We and you (and your Owners and guarantors) fully waive any right to or claim for any punitive or exemplary damages against each other. If any dispute arises between the parties, each party will be limited to recovery of actual damages which, in our case, includes liquidated damages in Section 16 or damages provided in the Lanham Act or its state counterpart.

**22.11   Attorney Fees.** We will be entitled to collect, in addition to any award of damages or injunctive relief, our costs in enforcing our rights under this Agreement against you, including reasonable attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses. We will also be entitled to collect our attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses in the event we are the prevailing party with respect to any claim or counterclaim or other legal proceeding brought by you against us in connection with this Agreement or our relationship.

**22.12   USA PATRIOT Act and Foreign Assets Control Regulations Compliance.** You will, at all times, operate in compliance with any applicable laws, rules and regulations, including the USA PATRIOT Act (Public Law 107-56) and Foreign Assets Control Regulations (31 CFR Parts 500; 501). You represent and warrant that you, your Owners, directors, and employees: (i) are not included on any U.S. government list (including the Office of Foreign Assets Control ("OFAC")) of Persons with whom financial or similar transactions are prohibited; and (ii) are not subject to embargo or sanctions under OFAC regulations or similar U.S. government laws, regulations, or Executive Orders. Further, you will promptly notify us if any of the covenants and representations in this Section are inaccurate, and you will cooperate with us in any resulting audits or investigations.

**22.13   Variations Among Agreements.** We reserve the right to vary standards for any other franchisee based on a particular area, circumstance, business practice or other condition that we deem important to the other franchisee's successful operation. You have no rights based on our variation from standard practices and will not be entitled to require us to grant you a similar variation under this Agreement.

**22.14   Opportunity to Investigate.** You acknowledge that you have had full opportunity to investigate independently our operations and be thoroughly advised of the terms and conditions of this Agreement by counsel of your choice. Unless expressly provided otherwise, this Agreement is exclusively for our and your benefit and may not give rise to liability to any third party unless specifically stated.

**22.15   Integration.** You acknowledge that we have fully explained our operations to you, that you understand their uses, benefits and limitations; and that we made no representations to you as to the financial benefit to be gained under this Agreement. You have not relied on any written or oral representations except those specifically made a part of this Agreement in writing. This Agreement, any Exhibits, and any Addendum signed by our authorized officer and you represents the entire integrated agreement between us and you and supersedes all prior negotiations or agreements, either written or oral, between the parties. This clause does not disclaim the representations of the Disclosure Document. DO NOT SIGN THIS AGREEMENT IF YOU BELIEVE WE OR ANY OF OUR REPRESENTATIVES HAS PROMISED YOU SOMETHING THAT IS NOT PART OF THIS AGREEMENT, ANY ATTACHED ADDENDUM OR THE DISCLOSURE DOCUMENT.

**22.16   Consent.** In those instances where our prior consent is required without identifying the method or timing for consent, you will request consent in writing, and we will notify you of our decision within thirty (30) days after receiving your written request and all supporting documents. Whenever our consent or approval is required under this Agreement, it must be in writing. If we do not respond within thirty (30) days, the request is deemed denied. Our consent or approval will be effective only to the extent specifically stated and we will not be deemed to waive our right to consent to or approve any later



ERA EXHC 03/13                                   - 27 -



request.   Except where this Agreement expressly states that we will not unreasonably withhold our approval of or consent to any action or request by you, we have the right to withhold our approval of or consent to any action requested by you.

**22.17   Our Rights.**   Whenever this Agreement provides that we have a certain right, that right is absolute and the parties intend that our exercise of that right will not be subject to any limitation or review.   We have the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by this Agreement.

**22.18   Our Reasonable Business Judgment.**   Whenever we reserve discretion, or are deemed to have reserved discretion, in a particular area or we agree or are deemed to be required to exercise our rights reasonably or in good faith, we will satisfy our obligations by exercising Reasonable Business Judgment in making our decision or exercising our rights.   Neither you nor any third party (including, without limitation, a trier of fact) shall substitute its judgment for our Reasonable Business Judgment.

**22.19   Counterparts/Facsimiles.**   This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one and the same agreement.   Electronic or facsimile copies of this Agreement have the same force and effect as the original and will be fully binding on all parties.

**22.20   Further Assurances.**   The parties will execute any documents necessary to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

**23.0   ADDITIONAL REPRESENTATIONS:**   You make the following additional warranties and representations that are an inducement on which we are relying to enter into this Agreement:

**23.1**   The information in the franchise application is accurate and complete.   Any consents or authorizations in the application are incorporated into this Agreement and are effective for the Term.

**23.2**   You are not obtaining this Franchise for speculative purposes and have no present intention to sell or transfer or attempt to sell or transfer the Franchise in whole or in part.

**23.3**   You acknowledge the importance of the high and uniform standards of quality, appearance and service imposed by us in order to maintain the value of our name and the necessity of operating the Office in compliance with our Standards.   You represent that you have the ability and intention to meet those Standards.

**23.4**   You have procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for you to carry on the Business contemplated by this Agreement.

**23.5**   Your signing of this Agreement does not violate or breach any other agreement or commitment to which you are bound.

**23.6**   Neither we nor any of our employees or representatives made any representations, promises, guarantees or warranties of any kind to induce you to sign this Agreement, except as specifically described in the Disclosure Document delivered to you.   You acknowledge that the success of the Franchise is dependent on you and your Owners' efforts.   Your non-exclusive right to use the System and its programs does not imply or guarantee you any level of business, any specific advertising programs, any number of recruits,





or the receipt of referrals from our other franchisees or our Related Parties' franchisees.  You and the Owners represent that you each intend to engage in the management or supervision of the Franchise.

**23.7**    You and each Owner has read fully this Agreement, the P&P Manual table of contents, and the Franchise Disclosure Document, and understand their terms and represent that each is able to and will comply with the franchise requirements described in the Standards.  You acknowledge that you have had not less than 14 calendar days to review our Franchise Disclosure Document before signing this Agreement.

**23.8**    As of the Opening Date, the Owners will be and, during the entire Term will remain, in full compliance with all applicable U.S. laws and regulations that prohibit unfair, fraudulent or corrupt business practices in the performance of your obligations under this Agreement and related activities.

**24.0**    **STATE LAW ADDENDA.**  The state law addenda included in Exhibit G are an integral part of this Agreement.  If you are a resident of California, Georgia, Illinois, Maryland, Minnesota, North Dakota, Rhode Island, South Dakota, Washington or Wisconsin, the respective state law addendum included in Exhibit F applies to you upon your execution of this Agreement.



ERA EXHC 03/13                              - 29 -





**ERA**

**EXHIBIT A**
**REAL ESTATE FRANCHISE AGREEMENT**

---

Franchisee's Legal Name: LBH National Corporation
Business Name: Shorewood Realtors ERA or Shorewood Realtors ERA Powered

This Exhibit is an integral part of the Real Estate Franchise Agreement ("Agreement") between ERA Franchise Systems LLC ("we" or "us") and you ("Franchisee" or "you"). This Exhibit will not be modified except by written agreement signed by both you and us.

**OWNERSHIP INTERESTS**

**I.    Franchisee Ownership.** You represent and warrant that the following Persons own ownership interests in Franchisee as stated below:

Name:                                                Interest:

| Roger A. Herman | 100% |
|---|---|
|  |  |



**II.    Underlying Ownership.** The words "Owner" and "Owners" in the Agreement include each "Person" who has a direct ownership interest in Franchisee. If any Owner listed above is a corporation, partnership or other legal entity, you represent and warrant that the ownership interest stated below for the Owners are accurate and complete:

Name of Legal Entity: _____

Name:                                                Ownership Interest:

|  |  |
|---|---|
|  |  |
|  |  |
|  |  |

If additional legal entities are Owners of Franchisee or if additional Persons have ownership interests in the legal entity listed above, such information is included on additional pages attached to, and made a part of, this Exhibit A.

ERA EXHC 03/13                                        - 30 -



**ERA**

**EXHIBIT B**
**REAL ESTATE FRANCHISE AGREEMENT**

**GUARANTY OF PAYMENT AND PERFORMANCE**

This Guaranty of Payment and Performance is given by the undersigned, Roger A. Herman (individually a "Guarantor" and collectively "Guarantors"), effective as of the Effective Date of the Franchise Agreement to ERA Franchise Systems LLC ("Franchisor"), in order to induce Franchisor to accept LBH National Corporation, a California corporation ("Franchisee") as a franchisee of Franchisor.

Each Guarantor, independently of Franchisee's obligations, jointly and severally, guarantees to Franchisor the prompt payment and performance, when due of all of Franchisee's obligations under the Franchise Agreement(s) between Franchisor and Franchisee, including any renewal, replacement or modification of the agreement (the "Agreement"), and other agreements or instruments of indebtedness now existing or hereafter entered into by Franchisee and Franchisor. This Guaranty applies to all obligations in the Agreement, including payment of the initial franchise fee, all Royalty Fees, advertising fund contributions, charges for manuals, supplies, materials, services and products furnished by Franchisor, audit fees, assignment fees, attorneys fees, referral fees, obligations to indemnify and other such charges, fees and assessments under the Agreement. This Guaranty incorporates by reference, as if contained fully in this Guaranty, Sections 22.9 (Waiver of Jury Trial) and 22.10 (Waiver of Punitive Damages) of the Agreement, and the Guarantors knowingly and voluntarily waive their right to a jury trial and to seek punitive damages. Guarantors also agree that Section 22.8 (Waiver of Class Action) of the Agreement is incorporated in this Guaranty, as if contained fully in this Guaranty, and Guarantors waive any right to proceed against Franchisor by way of a class action.

This Guaranty will be deemed continuing in nature and will apply to Franchisee's obligations for the Office(s) (as defined in the Agreement) and all Future Branch Office(s) (as defined in the Agreement). This Guaranty will not be discharged by any compromise of any debt and/or the extension of payment deadlines. Guarantors waive defenses based on presentment, demand, protest, notice of protest and dishonor, and diligence in collecting any obligation under the Agreement. Franchisor will not be required to pursue any remedy against Franchisee as a condition of the Guarantors' obligation under this Guaranty.

It will not be a condition to the enforcement of this Guaranty that Guarantors will be given any notice.

The obligation of each Guarantor is an absolute and unconditional obligation and constitutes a guaranty of payment and performance. Separate action(s) may be brought and prosecuted against Guarantors whether action is brought against Franchisee or Franchisee is joined in any such action(s). Guarantors waive to the fullest extent permitted by law, the benefit of any statute of limitations affecting their liability under this agreement or the enforcement of this Guaranty. Any Guarantor who is a married person agrees that recourse may be had against his or her separate property for his or her obligations under the Agreement. Without the prior written consent of Franchisor, Guarantors will not transfer any assets described in the Personal Financial Statement (or such other similar document) submitted to Franchisor for review and acceptance of Franchisee to an individual, trust or other legal entity for the purpose of protecting or shielding such assets from the claims or rights that Franchisor may have under this Guaranty.



ERA EXHC 03/13                                   - 31 -



**ERA**

Each Guarantor expressly waives notice of the acceptance of this Guaranty and agrees that Franchisor's actions or failure to act will not in any way limit or discharge Guarantor's liability under this Guaranty.

This Guaranty and the Guarantors' liabilities and obligations under this Guaranty are binding on Guarantors and their respective heirs, executors, successors and assigns (and if applicable, successor trusts and trustees), and inure to the benefit of and are enforceable by Franchisor and its successors, transferees, and assigns.

This Guaranty will be governed by the laws of the State of New Jersey in all respects, including matters of construction, validity, and performance, and its terms and provisions may not be waived, altered, modified, or amended except in writing duly signed by an authorized officer of Franchisor and by Guarantors.

Each Guarantor submits to the non-exclusive personal jurisdiction of the state and federal courts of New Jersey with respect to any claims arising out of the Agreement, this Guaranty or the business relationship between Franchisor and Franchisee. Such litigation will have venue in the state courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty will be construed as if it did not contain that provision, and the rights and liabilities of the parties will be construed and enforced accordingly.

This Guaranty may be executed in counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one Guaranty. Electronic and facsimile copies of this Guaranty will be deemed to have the same force and effect as the original and will be fully binding on all Guarantors.

**THE GUARANTORS SIGNING THIS GUARANTY REPRESENT AND WARRANT THAT THE PERSON SIGNING THE AGREEMENT IS AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THE AGREEMENT AND ANY FUTURE AGREEMENTS UNLESS THEY PROVIDE NOTICE OTHERWISE TO FRANCHISOR. THE GUARANTORS ACKNOWLEDGE THAT FRANCHISOR IS EXPRESSLY RELYING ON THIS REPRESENTATION IN ENTERING INTO THE AGREEMENT.**

Roger A. Herman, Individually and Personally







**ERA**

**EXHIBIT C**
**REAL ESTATE FRANCHISE AGREEMENT**

**GLOSSARY OF TERMS**

For your reference, the capitalized terms used in the Agreement will have the meaning set forth below.

**"Annual Gross Revenue"** is defined in Section 7.2.6.

**"Branch Office"** is any approved ERA® Office you operate, other than the Main Office.

**"Broker Price Opinions"** means standard, non-substantive residential value estimates issued to financial institutions or others for a nominal fee and do not include appraisals or other substantive estimates or opinions of value.

**"Business"** means the operation of a real estate brokerage under the terms of this Agreement.

**"Calculation Year"** is defined in Section 7.2.

**"Client Information"** is defined in Section 16.7.3.

**"Confidential Information"** means information owned or licensed by us and involving the operation of the Business, including without limitation, the P&P Manual, procedures related to our proprietary communications and referral systems, and other methods and information. Confidential Information does not include information that (a) is or becomes generally available to the public; (b) was within the recipient's possession prior to it being furnished; or (c) is or becomes available to the recipient from a source that is not, to its knowledge, prohibited from disclosing such information to it by a legal, contractual, or fiduciary obligation of confidentiality.

**"CPI"** is defined in Section 12.1.

**"Disclaimer"** is defined in Section 4.9.

**"Disclosure Document"** means our Franchise Disclosure Document used in the offer and sale of franchises in your state in effect at the time you sign the Agreement.

**"Effective Date"** is defined in Section 1.1.

**"Excluded Business"** means any business you or your Related Party operates other than the Business, as defined in Section 2.

**"Expiration Date"** is defined in Section 1.5.

**"Franchisee"** is defined in Section 1.1

**"Franchisor"** is defined in Section 1.1.

**"Future Branch Office"** is defined in Section 5.4.

**"Gross Revenue"** means all money or things of value, calculated at their fair market value in United States currency, received or receivable (earned but not yet received), by you (including, without limitation, all revenues and commissions whether or not other individuals or entities are entitled to retain such revenues or commissions), directly or indirectly, in connection with the Business (earned in compliance with all laws) including transactions and services that require a real estate or auctioneer's license and/or in which you use the Marks or the System in any manner. "Gross Revenue" will include all such revenue before the deduction of any fees, costs or expenses you incur, except for referral fees you pay to: (i) other licensed brokers operating under a Realogy brand franchise agreement; (ii) any referral networks owned or operated by Realogy or its Related Parties; or (iii) brokers or referral networks not related to Realogy, unless you pay more than 5% of your annual Gross Revenue to





**ERA**

non-Realogy brokers or referral networks, in which case all such referral fees you pay that exceed the 5% cap will be considered Gross Revenue. Moreover, any amounts deposited in the Business's bank accounts will be deemed Gross Revenue earned in compliance with all laws unless proven otherwise.

**"Improvements"** is defined in Section 14.2.

**"Main Office"** is the first ERA Office you operate (or such other substitute Office that has been designated as your Main Office).

**"Marks"** means the trademarks, service marks and trade dress that we authorize you to use in the P&P Manual, including all additional or substitute trademarks, service marks and trade dress that we may authorize you to use.

**"Minimum Monthly Royalty Fees"** is defined in Section 7.1.4.

**"Minimum Operating Standards"** is defined in Section 16.2.6.

**"New Franchisee"** is defined in Section 15.6.

**"Office"** means any Office covered by this Agreement as of the Effective Date or later added by a writing signed by both parties.

**"Opening Date"** is defined in Section 1.7.

**"Owner"** is defined in Section 1.3 and Exhibit A.

**"Person"** means an individual, a partnership, a trust, a corporation, a limited liability company, an association and any other incorporated or unincorporated organization or entity.

**"Personal Transaction"** is defined in Section 7.1.2.

**"P&P Manual"** means our Policy and Procedures Manual, including the Identity Standards.

**"Property Management Services"** means acting as agent for an owner of real property (including projects governed by Homeowners' Associations, apartment complexes, and resort properties), performing all services required in connection with the day-to-day management and operation of the property, including, but not limited to: (i) collecting rents or other amounts due the property owner; (ii) enforcing tenants' lease obligations; (iii) receiving service of process for litigation or condemnation proceedings; (iv) securing permits and licenses for the property's management and operation; (v) contracting for or overseeing utility repairs, maintenance, alterations, and/or purchasing and maintaining equipment, personal property, supplies or materials; (vi) performing property maintenance services; (vii) performing construction services on the property; and/or (viii) any short-term leasing or rental activity (having a nonrenewable term of less than 90 days). Leasing or rental activity involving longer term rentals ("Extended Rentals") will only be considered Property Management Services if, in connection with the Extended Rentals, you perform additional Property Management services described above and your fees for the Extended Rentals are not distinguishable from the other Property Management service fees.

**"Qualified ERA Firm"** means an ERA Firm that is eligible to receive VIP under this Agreement and the P&P Manual.

**"Realogy"** means Realogy Group LLC (formerly known as Realogy Corporation), its successors and assigns.

**"Reasonable Business Judgment"** means any decision we make or action we take that promotes or benefits the System generally, even if the decision or action also promotes our financial or other interest, or if other reasonable or arguably preferable alternatives exist and regardless of whether an individual brokerage may be unfavorably affected. This includes, but is not limited to, our actions to (i) increase the value of the Marks; (ii) increase or enhance the





overall franchisee or customer satisfaction; (iii) minimize possible brand inconsistencies or customer confusion; (iv) enhance or encourage modernization; or (v) improve the competitive position of the System.

"**Related Party**" means, with respect to a particular Person, a Person who, directly or indirectly, owns or controls that Person, is owned or controlled by that Person, or is under common control with that Person. Control, in this context, means the possession of executive power to direct or to cause the direction of the management and policies of a Person, whether through voting power, ownership, by contract or otherwise.

"**Responsible Broker**" means your licensed real estate broker as required under the laws of the state in which the Office is located.

"**Restricted Party**" is defined in Section 20.4.

"**Royalty Fee**" has the meaning in Section 7.1.

"**Standards**" means our mandatory specifications, standards, methods and procedures prescribed by us in the P&P Manual, the Identity Standards Manual or this Agreement.

"**Start-Up Company**" is defined in Section 20.4.

"**System**" means the business format and methods developed or licensed by us for the promotion of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market. The System includes use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs. We may update the System at any time and expect to continue to do so in our sole discretion. The System does not include any real estate or other investment syndication business of any kind.

"**System Components**" is defined in Section 4.5.1.

"**Term**" is defined in Section 1.5.

"**Trade Name**" is defined in Section 2.1.

"**Transfer of the Franchise**" is defined in Section 15.4.

"**URL**" means uniform resource locator (also known as a domain name or web site address).

"**VIP Table**" is defined in Section 7.2.

"**Volume Incentive Plan Award**" is defined in Section 7.2.





**ERA**

## EXHIBIT D
## REAL ESTATE FRANCHISE AGREEMENT

### AUTHORIZED OFFICES

You are authorized to operate Offices under the terms of this Agreement at the following addresses:

| | |
|----|---|
| 1. | 950 Artesia Blvd., Hermosa Beach, CA 90254 |
| 2. | 917 Manhattan Beach Blvd., Manhattan Beach, CA 90266 |
| 3. | 916 Manhattan Ave., Manhattan Beach, CA 90266 |
| 4. | 3300 Highland Ave., Manhattan Beach, CA 90266 |
| 5. | 16 Malaga Cove Plaza, Palos Verdes Estate, CA 90274 |
| 6. | 431 Main Street, El Segundo, CA 90245 |
| 7. | 1009 Torrance Blvd., Redondo Beach, CA 90277 |
| 8. | 1543 E. Palmdale Blvd., Suite N, Palmdale, CA 93550 |
| 9. | 72960 Fred Waring Dr., Suite #110, Palm Desert, CA 92260 |
| 10. | 205 Pier Ave, Suite 201, Hermosa Beach, CA 90254 |
| 11. | 1230 Rosecrans Ave., #160, Manhattan Beach, CA 90266 |
| 12. | 3201 Manhattan Ave., Hermosa Beach, CA 90254 |
| 13. | 350 N. Sepulveda Blvd., #8, Manhattan Beach, CA 90266 |
| 14. | 805 Manhattan Ave., Manhattan Beach, CA 90266 |
| 15. | 717 Yarmouth Rd., Palos Verdes Peninsula, CA 90274 |
| 16. | 1148 Manhattan Ave., #6, Manhattan Beach, CA 90266 |
| 17. | 3508 Highland Ave., Manhattan Beach, CA 92066 |
| 18. | 1020 Manhattan Beach, Suite 106, Manhattan Beach, CA 90266 |

This Exhibit is an integral part of the Real Estate Franchise Agreement ("Agreement") between ERA Franchise Systems LLC ("we" or "us") and you ("Franchisee" or "you"). This Exhibit will not be modified except by written agreement signed by both you and us.



ERA EXHC 03/13                               - 36 -



**ERA**

## EXHIBIT E
### REAL ESTATE FRANCHISE AGREEMENT

### 2013 VOLUME INCENTIVE PLAN TABLE

| | Adjusted Gross Revenue Ranges | | Maximum Range Amount | Multiplier Rate | Maximum Award Per Range | Cumulative Maximum Award |
| | From | To | | | | |
|---|---|---|---|---|---|---|
| I | $0 | $1,756,061 | $1,756,061 | 0.00% | $0 | $0 |
| II | $1,756,062 | $2,487,754 | $731,691 | 0.00% | $3,750 | $3,750 |
| III | $2,487,755 | $3,219,446 | $731,691 | 1.25% | $9,146 | $12,896 |
| IV | $3,219,447 | $5,414,523 | $2,195,076 | 1.50% | $32,926 | $45,822 |
| V | $5,414,524 | $7,609,599 | $2,195,076 | 1.75% | $38,414 | $84,236 |
| VI | $7,609,600 | $9,804,676 | $2,195,076 | 2.00% | $43,902 | $128,138 |
| VII | $9,804,677 | $11,999,753 | $2,195,076 | 2.25% | $48,389 | $177,527 |
| VIII | $11,999,754 | $14,194,829 | $2,195,076 | 2.50% | $54,877 | $232,404 |
| VIV | $14,194,830 | $16,389,906 | $2,195,076 | 2.75% | $60,365 | $292,768 |
| X | $16,389,907 | and above | No Maximum | 3.00% | No Maximum | No Maximum |



*No maximum, award will be calculated at 3% of Gross Revenues above $16,389,907

(1)    Within each range over $2,487,754, an Award is calculated by multiplying the "Gross Revenues" achieved by you within the range by the "Multiplier Rate" for that range. The total Volume Incentive Plan for any year is equal to the sum of the Volume Incentive Plan attributable to all the ranges.



ERA EXHC 03/13                    - 37 -



**ERA**

**EXHIBIT F**
**REAL ESTATE FRANCHISE AGREEMENT**

**SECURITY AGREEMENT**

This Security Agreement ("Security Agreement") is made as of <u>February 11, 2014</u>, between **LBH National Corporation, a California corporation** ("Debtor"), and ERA Franchise Systems LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

<u>SECTION 1 – DEBTOR'S OBLIGATIONS.</u> Debtor agrees to the following:

(a)      Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)      Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)      Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)      Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)      Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

ERA EXHC 03/13                          - 38 -







**ERA**

**SECTION 2 – DEFAULTS.**  Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)    The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b)    Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)    The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d)    The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)    Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

(a)    In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

1)    Declare all obligations secured hereby immediately due and payable;

2)    Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

3)    Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

4)    Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)    Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses.  Debtor shall remain liable for any deficiency.





**SECTION 4 – INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 – DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

(a)     Debtor's Obligations Under Note. Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)     Waiver. Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)     Governing Law. This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)     Remedies. All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)     Financing Statement. Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)     Notices. In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)     Attorney's Fees. In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)     Successors in Interest. This Security Agreement shall inure to the benefit of, and be

ERA EXHC 03/13                    - 40 -





binding upon, the successors in interest of the parties hereto.

(i)       Amendments.  This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)       Entire Agreement.  The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)       Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

LBH National Corporation

By: _____
Name: Roger A. Herman
Title: Authorized Officer

ERA FRANCHISE SYSTEMS LLC

By: _____
Andrew G. Napurano
CAO & CFO, Realogy Franchise Group



**ERA**

EXHIBIT G
REAL ESTATE FRANCHISE AGREEMENT

STATE LAW ADDENDA

## CALIFORNIA

For a Franchisee who is a resident of California, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.    Termination and Non-renewal:  Section 16 of this Agreement relates to renewal and termination of the franchise.  California Business and Professions Codes Sections 20000 through 20043 provide rights to you concerning termination or non-renewal of the franchise.  If this Agreement contains a provision that is inconsistent with the law, the law will control.

    B.    Limitations Period:  Section 19.2 of this Agreement is deleted.

## GEORGIA

If you are a resident of Georgia, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.  Section 20.1 of the Agreement is deleted in its entirety and replaced with the following:

    **20.1    In Term.**  During the Term, you, your Owners, officers, guarantors, and any of the immediate family members of the Owners, officers, guarantors, and Responsible Broker will not, directly or indirectly, through ownership or otherwise, engage in any other real estate brokerage business within 15 miles of any Office authorized under this Agreement without our advance written consent.

## ILLINOIS

If you are a resident of Illinois, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.    Illinois law applies to this transaction and supersedes any conflicting provisions of this Agreement or New Jersey law.

    B.    Termination and Non-renewal:  Section 16 of this Agreement relates to renewal and termination of the franchise.  The conditions under which the franchise can be terminated and your rights on non-renewal may be affected by Illinois law, specifically Illinois Compiled Statutes 1992, Chapter 815, Sections 705/19 and 705/20.

    C.    Illinois Cause of Action:  Section 22.7of this Agreement relates to dispute resolution, including judicial proceedings.  Notwithstanding the provisions of Article 16.0, (i) the Act applies to this Agreement and supersedes any conflicting provisions of this Agreement and New Jersey law, and (ii) any provision in this Agreement that designates





jurisdiction or venue in a forum outside of Illinois is void provided that this Agreement may provide for arbitration in a forum outside of Illinois.

D.    Release or Waiver:  Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois Franchise Disclosure Act or any other law of the state of Illinois is void; provided, however, that this Section will not prevent any  person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of the Illinois Franchise Disclosure Act.

## MARYLAND

If you are a resident of Maryland or you are a resident of another state and you intend for the franchise to be operational in Maryland, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.    Franchisee may bring a lawsuit in Maryland against Franchisor for claims arising under the Maryland Franchise Registration and Disclosure Law.

B.    The general release required as a condition to renewal, sale and or assignment/transfer will not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

C.    Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

D.    The representations of Franchisee in the Franchise Agreement are not intended, nor will they act, as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

Each provision of this Section 24.3 will be effective only to the extent that, with respect to the provision, the jurisdictional requirement of the Maryland Franchise Registration and Disclosure Law are met independently without reference to this Section 24.3.

## MINNESOTA

If you are a resident of Minnesota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.    Termination and Non-renewal:  Section 16 of this Agreement relates to renewal and termination of the franchise.  With respect to franchises governed by Minnesota law, Franchisor will comply with Minnesota Statutes, Section 80C.14, Subdivisions 3, 4, and 5, which require, except in certain specified cases, that the Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the Agreement.

B.    Sections 22.6 through 22.10 of this Agreement relate to judicial proceedings.  Judicial proceedings may, take place outside of Minnesota.  The provisions of Sections 22.6 through 22.10 will not in any way abrogate or reduce any right of Franchisee, as provided



ERA EXHC 03/13                                    - 43 -



**ERA**

under Minnesota Statutes, Chapter 80C, or Minnesota Rule 2860.4400J, including the right to submit matters to the jurisdiction of Minnesota courts or the right to a jury trial.

C.    Franchisee Indemnification: We agree to indemnify and save you harmless from any loss, costs or expenses arising out of or related to any claim, suit or demand against you relating to your use of the Marks in accordance with this Agreement.

D.    General Release Not Required: Notwithstanding any terms in this Agreement, you are not required to agree to any general release as a condition for approval of any assignment, transfer or renewal of this Agreement.

E.    No Waiver of Bond: Notwithstanding any terms of this Agreement, Franchisee is not required to consent in advance as to any application by Franchisor for injunctive relief or to waive any bond.

## NORTH DAKOTA

If you are a resident of North Dakota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

Revisions: The North Dakota Securities Commissioner has held the following to be appropriate and required revisions to franchise agreements for Franchisees in North Dakota:

A.    Covenants not to compete on termination or expiration of the franchise agreement that conflict with Section 9-08-06 of the North Dakota Century Code are generally unenforceable in the State of North Dakota.

B.    North Dakota law provides that any arbitration between franchisor and Franchisee relating to the franchise be held at a location mutually agreeable to both franchisor and Franchisee. North Dakota law prohibits mandatory arbitration at a site remote from the location of the franchise.

C.    North Dakota Franchisees are not required to consent to the jurisdiction of courts outside of North Dakota. All franchise agreements for North Dakota franchises will be governed by the laws of the state of North Dakota.

D.    Any provision of the franchise agreement requiring the Franchisee to consent to liquidated damages or termination penalties is unfair and inequitable to Franchisees.

E.    North Dakota Franchisees are not required to sign a general release on the renewal of the franchise agreement. Consequently, any provision of a franchise agreement as it applies to the requirement that Franchisee's execute a general release on renewal does not apply to North Dakota Franchises.

F.    North Dakota Franchisees are not required to consent to a waiver of the right to a class action. Consequently, Section 22.8 of the Agreement as it applies to the waiver of the right to a class action does not apply to North Dakota Franchisees.



ERA EXHC 03/13                                     - 44 -



**ERA**

G.    North Dakota Franchisees are not required to waive their right to a jury trial. Consequently, Section 22.9 does not apply to North Dakota Franchisees.

H.    North Dakota Franchisees are not required to consent to a waiver of exemplary and punitive damages. Consequently, Section 22.10 of the Agreement does not apply to North Dakota Franchisees.

I.    This Agreement will be governed by the laws of the state of North Dakota.

## RHODE ISLAND

If you are a resident of Rhode Island, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.    Jurisdiction and Venue: A provision in a franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of another State is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

B.    Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that:

"A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

This supersedes Section 22.7 or any other contrary provision of the Agreement.

## SOUTH DAKOTA

If you are a resident of South Dakota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.    South Dakota Law: Section 22.6 of this Agreement relates to the laws governing this Agreement. Notwithstanding anything to the contrary in Section 22.6, the law regarding franchise registration, employment, covenants not to compete, and other matters of local concern will be governed by the laws of the State of South Dakota. However, as to contractual and all other matters, this Agreement and all of its provisions will be and remain subject to the application, construction, enforcement and interpretation under the governing law in Section 22.6.

B.    South Dakota Cause of Action: Section 22.7 of this Agreement relates to, among other things, judicial proceedings between the parties. Notwithstanding anything to the contrary contained in Section 22.7, under South Dakota law any provision in this Agreement that designates jurisdiction or venue, or that requires Franchisee to agree to jurisdiction or venue, in a judicial forum outside of South Dakota is void with respect to any cause of action which is otherwise enforceable in South Dakota.





**ERA**

C.  Termination: Section 16 of this Agreement pertains to default and termination of the franchise. Notwithstanding the provisions of Section 16, you will be provided with 30 days' written notice and opportunity to cure any breach of this Agreement, any failure to meet performance and quality standards or any failure to make payments of Royalty Fees required by this Agreement.

D.  Disclaimers: Notwithstanding anything to the contrary contained in this Agreement, under South Dakota Codified Laws, Section 37-5B-21, any acknowledgment provision, disclaimer or integration clause; or other provision having a similar effect, in this Agreement will not negate or act to remove from judicial review any statement, misrepresentation or action that would violate this Chapter of the Law or a rule or order under this Chapter.

## WASHINGTON

If you are a resident of Washington, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.  Transfer Fees: Section 15 of this Agreement relates to franchise ownership and transfer. Section 15.5 requires the transferee of the franchise to pay a transfer fee. Transfer fees are collectable to the extent that they reflect franchisor's reasonable estimated or actual costs in effecting a transfer.

B.  Termination and Non-renewal: Section 16 of this Agreement relates to renewal and termination of the franchise. Washington statute, RCW 19.100.180 may supersede the franchise agreement in your relationship with Franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Agreement in your relationship with us, including the areas of termination and renewal of your franchise.

C.  Section 22.6 of this Agreement prescribes the laws governing this Agreement. Notwithstanding anything to the contrary contained in Section 22.5, in the event of a conflict of law, the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will take precedence.

D.  Inconsistent Provisions: If any of the provisions in our disclosure document or this Agreement are inconsistent with the relationship provisions of RCW 19.100.180 or other requirements of the Washington Franchise Investment Protection Act, the provisions of the Act will prevail over the inconsistent provisions of the disclosure document or this Agreement with regard to any franchise sold in Washington.

E.  Release or Waiver: Any release or waiver of rights executed by you will not include rights under the Washington Franchise Investment Protection Act except when executed under a negotiated settlement after the Agreement is in effect and where the parties are represented by independent counsel. Provisions like those that unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.







## WISCONSIN

If you are a resident of Wisconsin, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A.  Wisconsin Law:  The Wisconsin Fair Dealership Law applies to franchising in the State of Wisconsin.  This Law prohibits the termination, cancellation, non-renewal or substantial change of the competitive circumstances of a franchise agreement without good cause.

B.  Inconsistent Provisions:  The Wisconsin Fair Dealership Law supersedes any provisions contained in this Agreement that are inconsistent with the Law.  If a conflict under this Agreement arises, the Law will prevail.

C.  Written Notice: The Wisconsin Fair Dealership Law further provides that 90 days prior written notice of termination, cancellation, non-renewal or substantial change of the competitive circumstances of a franchise agreement must be given to the Franchisee.  The Franchisee has 10 days to cure the non-payment of fees to franchisor and 60 days to cure any other deficiency and, if the deficiency is so cured within the applicable cure period, the notice of termination is void.





ERA EXHC 03/13                                   - 47 -

# EXHIBIT B



Office No. 010155- Company

## CONVERSION PROMISSORY NOTE
### (New Franchisee)

February 20, 2014 (the "Note Date")

| MAKER: | LBH National Corporation |
|---|---|
| CO-MAKER(S): | Roger A. Herman and Kimberly S. Herman |
| HOLDER: | ERA FRANCHISE SYSTEMS LLC |
| PLACE FOR PAYMENT: | 175 PARK AVENUE, MADISON, NJ |
| PRINCIPAL: | $1,500,000 |
| ANNUAL INTEREST RATE: | 0%, EXCEPT AS DESCRIBED BELOW |
| MATURITY DATE: | December 31, 2026 |

1. **TERMS OF PAYMENT.** FOR GOOD AND VALUABLE CONSIDERATION, the undersigned Maker and Co-Maker(s) promise(s) to pay Holder (or its successors or assigns) the Principal set forth above on the Maturity Date. Payments are payable to Holder at 175 Park Avenue, Madison, New Jersey, or at such other place as Holder may designate in writing.

2. **FORGIVENESS.** If on December 31 of each full calendar year ("Measurement Date") after the Note Date, Maker and Co-Maker(s) satisfy the conditions in this Note, an amount equal to the Principal divided by <u>twelve</u> (the "Yearly Principal") will be forgiven by Holder. To qualify for forgiveness of the Principal, Maker and Co-Maker(s) must establish that, as of the Measurement Date and for the calendar year concluding on the Measurement Date:

    A. Maker is not in default of its obligations under any franchise agreement(s) with Holder (the "Franchise Agreement"), including payment of royalty fees and marketing fund contributions; <u>and</u>

    B. Maker(s) has timely paid Holder all royalty fees and marketing contributions owed under the Franchise Agreement on aggregate Gross Revenues (as defined in the Franchise Agreement) of at least <u>$35,000,000</u> ("Forgiveness Threshold").

3. **YEARLY PRINCIPAL DUE ON FAILURE TO SATISFY CONDITIONS.** If Maker does not satisfy the above conditions as of any Measurement Date, the Yearly Principal shall become due and payable to Holder within 30 days after the Measurement Date. If Maker or Co-Maker(s) fails to make any payment when due, including any payment due on acceleration of this Note, the entire outstanding Principal shall bear simple interest at a rate equal to the lesser of eighteen percent (18%) per year or the highest rate allowed by law, from its due date until paid in full. Notwithstanding the foregoing, if in any two of the first three Measurement Dates Maker



fails to achieve the Forgiveness Threshold, upon written notice from Maker, the Yearly Principal shall be forgiven.

4. **APPLICATIONS OF FUNDS DUE MAKER.** Maker agrees that Holder, at its sole option, without notice, may apply to the outstanding due and payable Principal (and accrued and unpaid interest amount) payments due to Maker(s) from Holder under the ERA Volume Incentive Plan described in the Franchise Agreement, if any ERA Volume Incentive Plan Award becomes due or payable to Maker. To the extent necessary, Maker(s) hereby assigns, transfers and/or conveys to Holder all of Maker's rights, title and interest in and to the ERA Volume Incentive Plan Award. Any and all amounts of the ERA Volume Incentive Plan Award applied against the Principal shall correspondingly reduce amounts owed by Maker(s) hereunder.

5. **DEFAULT – ACCELERATION OF PRINCIPAL.** Holder may determine that Maker and Co-Maker(s) are in default and may accelerate the unpaid Principal and all accrued interest to become immediately due and payable, without presentment for payment or any notice or demand, upon the occurrence of any of the following:

A. Maker or Co-Maker(s) (i) suspends business; (ii) becomes insolvent or offers settlement to any creditors; (iii) files a petition in bankruptcy, either voluntary or involuntary; (iv) institutes any proceeding under any bankruptcy or insolvency laws relating to the relief of debtors; (v) makes an assignment for the benefit of creditors; or (vi) makes any false statement or representation orally or in writing, fails to furnish information, or fails to permit inspection of any books or records on demand of Holder;

B. Upon default in payment of any Principal payment due under this Note;

C. Upon default, in Holder's sole opinion, of any other agreement or note between Maker and Holder or any of Holder's related companies, including, but not limited to, the Franchise Agreement; or

D. Upon termination or expiration of the Franchise Agreement.

E. Maker does not open its Offices under Holder's marks on or before February 25, 2014.

For the purposes of this Note, a party will be in default of an agreement if the party has been given notice of default under the agreement, and, for defaults for which the party is afforded an opportunity to cure under the applicable agreement, the party failed to cure within the period provided. Maker's and Co-Maker(s)'s obligation to pay the Principal and interest, if accelerated, will be absolute and unconditional, and will not be subject to any rights of offset or recoupment.

6. **ASSIGNMENT.** This Note is not assignable by Maker or any Co-Maker without the prior written consent of Holder.

ERA EXHE 03/13                                      2

7. <u>NO PRE-PAYMENT PENALTY</u>. Maker and Co-Maker(s) may prepay this Note in whole or in part on any date without premium or penalty. No partial prepayment shall extend or postpone the due date of any subsequent installment payment or change the amount of the installment payment. Prepayments will be applied without notation on this Note.

8. <u>ATTORNEYS' FEES</u>. Maker and Co-Maker(s) agree to pay all expenditures made in any attempt to collect any amounts due pursuant to this Note. If Holder takes legal action to enforce or collect this Note, Holder shall be entitled to reasonable attorney's fees (including in-house attorneys) and court costs and all costs of collection in addition to any other relief to which it may be entitled.

9. <u>WAIVER OF PRESENTMENT</u>. Maker and Co-Maker(s) and each of them, waive, to the fullest extent permitted by law, diligence, demand, notice of demand, presentment for payment, notice of non-payment, notice of dishonor, protest and notice of protest and specifically consent to and waive notice of any renewals, extensions, amendments or modifications of this Note, whether made to or in favor of Maker or any other person or persons. Holder reserves the right to modify the terms of this Note, grant extensions, notations, renewals, releases, discharges, compositions and compromises with any party liable under this Note, with or without any notice to or the consent of, and without discharging or affecting the obligations of, any other party liable under this Note. The claiming of any statute of limitations as a defense to any demand against Maker, Co-Maker(s) or any endorser or guarantor is expressly waived by each and all of said parties.

10. <u>ACQUISITION-RELATED REPRESENTATIONS</u>. If this Note is being executed in connection with the acquisition or consolidation (by merger, acquisition or otherwise) of a real estate brokerage business from another person or entity, Maker and Co-Makers agree that while Holder and its representatives may have participated in the negotiation of such acquisition and assisted with the preparation of documents (legal or otherwise), Holder and its representatives were acting solely in the capacity of franchisor and were not retained by Maker or any Co-Maker in the capacity of agent, consultant or advisor. Maker and each Co-Maker agree that they have not and will not rely on any financial, legal or accounting advice about the acquisition that may have been provided by Holder or any of its employees, representatives, or affiliates. Maker represents and warrants that it has completed any due diligence and other investigations of the acquired office as Maker deemed appropriate. Additionally, Maker agrees that it has not relied on any representations made by Holder or any of its representatives or affiliates in deciding to complete the acquisition and related transactions. Maker waives any and all claims against Holder and its officers, directors, shareholders, affiliates, employees and agents arising out of the acquisition or consolidation.

11. <u>GOVERNING LAW/CONFIDENTIALITY/COUNTERPARTS</u>. This Note will be construed and enforced in accordance with the laws of the State of New Jersey. The terms of this Note are confidential and will not be disclosed to any third party by Maker without the prior written consent of Holder, unless otherwise required by law. This Note may be executed in counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one Note.



ERA EXHE 03/13                                        3



12.  **JOINT AND SEVERAL LIABILITY.** This Note will be the joint and several obligation of Maker, Co-Maker(s), all guarantors and endorsers, if any, and will be binding upon them and their heirs, executors, personal representatives, successors and assigns and will inure to the benefit of Holder and its successors and assigns.

13.  **CONFESSION OF JUDGMENT.** Maker and Co-Maker(s) agree that any attorney-at-law may appear in any court of record situated in any County where the Maker and/or Co-Maker(s) then reside or in the County where Maker and/or Co-Maker signed this Note and being in the United States at any time after the debt evidenced will become due, either at its stated maturity or by declaration and will waive the issuing and service of process and confess judgment against the Maker and Co-Maker(s), jointly and severally, in favor of the Holder, for the amount then owing on this Note, together with the costs of suit and thereupon release all errors and waive all right of appeal.

14.  **HEADINGS.** The headings in this Note are for convenience only, do not constitute a part of this Note, and will not be deemed to have any legal effect.

[Remainder of page left blank; Signature page follows]

ERA EXHE 03/13                                          4

**THIS PROMISSORY NOTE MAY NOT BE ACCEPTED BY HOLDER WITHOUT ALL MAKER AND CO-MAKER SIGNATURES AND ALL WITNESS SIGNATURES AND ADDRESSES**

IN WITNESS WHEREOF, the undersigned Maker and Co-Maker(s) have executed this Note as of the date first set forth above.

WITNESS:

_____
*Witness Signature*

GERARD WENZEL
2488 S. OAKLAND CIRCLE
Aurora, Co. 80014
*Print Witness Name and Home Address*

MAKER: **LBH National Corporation**

By: _____

Name: Roger A. Herman
Title: **Authorized Person**

WITNESS:

_____
*Witness Signature*

GERARD WENZEL
2488 S. OAKLAND CIRCLE
Aurora Co 80014
*Print Witness Name and Home Address*

CO-MAKER(S): Roger A. Herman

_____
Roger A. Herman, **Individually**

WITNESS:

_____
*Witness Signature*

GERARD WENZEL
2488 S. OAKLAND CIRCLE
Aurora, Co. 80014
*Print Witness Name and Home Address*

CO-MAKER(S): Kimberly S. Herman

_____
Kimberly S. Herman, **Individually**

ERA EXHE 03/13                                    5

# EXHIBIT C



**ERA**

**EXHIBIT F**
**REAL ESTATE FRANCHISE AGREEMENT**

**SECURITY AGREEMENT**

This Security Agreement ("Security Agreement") is made as of **February 11, 2014**, between **LBH National Corporation, a California corporation** ("Debtor"), and ERA Franchise Systems LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

**SECTION 1 – DEBTOR'S OBLIGATIONS.** Debtor agrees to the following:

    (a)    Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

    (b)    Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

    (c)    Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

    (d)    Debtor *represents and warrants* to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

    (e)    Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.



**SECTION 2 – DEFAULTS.** Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)     The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b)     Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)     The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d)     The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)     Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

(a)     In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

    1)     Declare all obligations secured hereby immediately due and payable;

    2)     Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

    3)     Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

    4)     Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)     Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

ERA EXHC 03/13                         - 39 -



**SECTION 4 – INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 – DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

(a)     Debtor's Obligations Under Note.  Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)     Waiver.  Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)     Governing Law.  This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)     Remedies.  All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)     Financing Statement.  Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)     Notices.  In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail.  Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent.  Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)     Attorney's Fees.  In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)     Successors in Interest.  This Security Agreement shall inure to the benefit of, and be





binding upon, the successors in interest of the parties hereto.

(i)    Amendments.  This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)    Entire Agreement.  The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)    Facsimiles.  Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

LBH National Corporation

By: _____
Name: Roger A. Herman
Title: Authorized Officer

ERA FRANCHISE SYSTEMS LLC

By: _____

Andrew G. Napurano
CAO & CFO, Realogy Franchise Group

# EXHIBIT D



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER [optional] | |
| 973-407-2331 | |

| B. SEND ACKNOWLEDGMENT TO: (Name and Address) | |
|---|---|
| Realogy Group LLC - Diane Renna-Comstock<br>175 Park Avenue<br>Madison, NJ 07940<br>USA | DOCUMENT NUMBER: 41812900005<br>FILING NUMBER: 14-7400723583<br>FILING DATE: 02/25/2014 10:41<br>IMAGE GENERATED ELECTRONICALLY FOR WEB FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LBH National Corporation | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 950 Artesia Blvd | Hermosa Beach | CA | 90254 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Corporation | CA | C3639929 ☐NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ERA Franchise Systems LLC | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 175 Park Avenue | Madison | NJ | 07940 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor and Co-Debtors may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor and Co-Debtors; and all general intangibles (collectively, the "Collateral") as well

**5. ALT DESIGNATION:** ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

☐6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
FS 2851

FILING OFFICE COPY



Page 2

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME LBH National Corporation | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

10. MISCELLANEOUS:

DOCUMENT NUMBER: 41812900005
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (11a or 11b) - do not abbreviate or combine names

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any ☐ NONE |

12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

| 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 12c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

| 13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing. 14. Description of real estate: | 16. Additional collateral description: as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid. |
|---|---|
| 15. Name and address of RECORD OWNER of above-described real estate (if Debtor does not have a record interest): | 17. Check only if applicable and check only one box. Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate 18. Check only if applicable and check only one box. ☐ Debtor is a TRANSMITTING UTILITY ☐ Filed in connection with a Manufactured-Home Transaction – effective 30 years ☐ Filed in connection with a Public-Finance Transaction – effective 30 years |

FILING OFFICE COPY

# EXHIBIT E

CD-120

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Calvin E. Davis (SBN: 101640); Aaron P. Rudin (SBN: 223004)<br>GORDON & REES LLP<br>633 West Fifth STreet, Suite 5200<br>Los Angeles, CA 90071<br>TELEPHONE NO.: 213-576-5000      FAX NO. *(Optional):* 213-680-4470<br>E-MAIL ADDRESS *(Optional):* cdavis@gordonrees.com; arudin@gordonrees.com<br>ATTORNEY FOR *(Name):* ERA Franchise Systems, LLC | *FOR COURT USE ONLY*<br><br>**RECEIVED**<br>**APR 2 8 2016**<br>**SOUTHWEST DISTRICT** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles**
STREET ADDRESS: 825 Maple Ave.
MAILING ADDRESS: 825 Maple Ave
CITY AND ZIP CODE: Torrance, CA 90503
BRANCH NAME: Torrance Courthouse

PLAINTIFF: ERA Franchise Systems, LLC

DEFENDANT: LBH National Corporation

| | |
|---|---|
| **ORDER FOR WRIT OF POSSESSION**<br>☐ AFTER HEARING    ☒ EXPARTE | CASE NUMBER:<br>YC071137 |

**AFTER HEARING**

1. ☐ The application of the plaintiff* for a writ of possession was heard as follows *(check boxes in 1c and 1d to indicate personal presence at the hearing):*

   a. Judicial Officer *(name):*

   b. Hearing date:             Time:           ☐ Dept.:           ☐ Rm.:

   c. ☐ Plaintiff *(name):*                    ☐ Attorney *(name):*

   d. ☐ Defendant *(name):*                    ☐ Attorney *(name):*

**EX PARTE**

2. ☒ The application of the plaintiff for an ex parte writ of possession has been considered by the court.

3. **The court finds:**

   a. ☐ Defendant has been properly served as required by Code of Civil Procedure section 512.030.
      *(Do not check this item if the application is ex parte.)*

   b. Plaintiff ☐ has  ☒ has not  filed an undertaking as required by Code of Civil Procedure section 515.010.

   c. Plaintiff has established the probable validity of the plaintiff's claim to possession of the following property *(specify):*

   ☒ Continued on Attachment 3c.

   d. ☒ There is probable cause to believe this property or some part of it is located at one or more of the following private places *(specify):*

   ☒ Continued on Attachment 3d.

*"Plaintiff" includes cross-complainant, and "defendant" includes cross-defendant.

| | | |
|---|---|---|
| | | Page 1 of 2 |
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CD-120 [Rev. January 1, 2006] | **ORDER FOR WRIT OF POSSESSION**<br>(Claim and Delivery) | Code Civ. Proc., §§ 512.020; 512.030;<br>512.070; 514.010–514.050; 515.010<br>www.courtinfo.ca.gov |
| | | American LegalNet, Inc.<br>www.USCourtForms.com |

**CD-120**

| PLAINTIFF: ERA Franchise Systems, LLC | CASE NUMBER |
|---|---|
| DEFENDANT: LBH National Corporation | YC071137 |

## ADDITIONAL FINDINGS FOR EX PARTE ISSUANCE OF WRIT OF POSSESSION

4. ☒ **The court also finds:**

  a. ☐    Defendant gained possession of the property described in item 3c, which was not entrusted to the defendant, by feloniously taking such property from the plaintiff by means other than by false or fraudulent representation, pretense, or embezzlement.

  b. ☐    The property is a credit card.

  c. ☒    Defendant acquired possession of this property in the ordinary course of the defendant's trade or business for commercial purposes, and (1) the property is not necessary for the support of the defendant or the defendant's family; (2) there is an immediate danger that the property will become unavailable to levy by reason of being transferred, concealed or removed from the state, or will become substantially impaired in value by acts of destruction, or by failure to take care of the property in a reasonable manner; and (3) the ex parte issuance of a writ of possession is necessary to protect the property.

  d.    Total number of boxes checked in item 4: 1

## ORDERS

5. **IT IS ORDERED**

  a.    The clerk of this court is directed to issue a writ of possession as provided in Code of Civil Procedure section 512.020, directing the sheriff or marshal within whose jurisdiction the property described in item 3c, or some part of it, is located, to seize such property and retain custody of it as provided in Code of Civil Procedure sections 514.010-514.050.

  b. ☒    The clerk is directed to issue the writ of possession immediately.

  c. ☐    The clerk is directed to issue the writ of possession upon the plaintiff's filing of a written undertaking, as required by Code of Civil Procedure section 515.010, in the amount of: $

  d.    The written undertaking required by the defendant for redelivery or to stay delivery is in the amount of: $

  e.    The clerk of this court is directed to attach a copy of this order and a copy of the plaintiff's undertaking to the writ of possession.

  f.    The sheriff or marshal may enter the following private place(s) to take possession of the property or some part of it:

       ☒    Continued on Attachment 5f.

  g. ☒    Defendant *(name):* LBH National Corporation
         is ordered to transfer possession of the property described in item 3c to the plaintiff. (Code Civ. Proc., § 512.070.)

**NOTICE TO DEFENDANT: Failure to comply with an order of the court to turn over possession of such property to the plaintiff may subject you to being held in contempt of court.**

6. Number of pages attached: 3

Dated: _____

                 _____
                              (JUDICIAL OFFICER)

                 ☐    Signature follows last attachment.

**ORDER FOR WRIT OF POSSESSION**
(Claim and Delivery)

American LegalNet, Inc.
www.USCourtForms.com

## ATTACHMENT 3C TO ORDER FOR WRIT OF POSSESSION

All LBH National Corporation's ("LBH's") accounts, accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in LBH's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing agreement and related rights which are located at or related to the residential real estate brokerage business conducted by LBH and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive program) to which LBH may be entitled pursuant to any franchise agreement entered into with ERA Franchise Systems, LLC, together with all such rights and property hereafter acquired by LBH, and all general intangibles (collectively, the "Collateral") as well as parts, replacements, substitutions, profits, products and cash and not cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto).

## ATTACHMENT 3D TO ORDER FOR WRIT OF POSSESSION

1) 950 Artesia Blvd., Hermosa Beach, CA 90254;

2) 917 Manhattan Beach Blvd., Manhattan Beach, CA 90266;

3) 916 Manhattan Ave., Manhattan Beach, CA 90266;

4) 3300 Highland Ave., Manhattan Beach, CA 90266;

5) 16 Malaga Cove Plaza, Palos Verdes Estates, CA 90274;

6) 431 Main Street, El Segundo, CA 90245;

7) 1009 Torrance Blvd., Redondo Beach, CA 90277;

8) 1543 E. Palmdale Blvd., Suite N, Palmdale, CA 93550;

9) 72960 Fred Waring Dr., Suite 110, Palm Desert, CA 92260;

10) 205 Pier Ave., Suite 201, Hermosa Beach, CA 90254;

11) 1230 Rosecrans Ave., #160, Manhattan Beach, CA 90266;

12) 3201 Manhattan Ave., Hermosa Beach, CA 90254;

13) 805 Manhattan Ave., Manhattan Beach, CA 90266;

14) 717 Yarmouth Road, Palos Verdes, CA 90274;

15) 1148 Manhattan Ave., #6, Manhattan Beach, CA 90266;

16) 3508 Highland Ave., Manhattan Beach, CA 90266;

17) 1020 Manhattan Beach Blvd., Suite 106, Manhattan Beach, CA 90266;

18) 2141 Rosecrans Ave., Suite 1160, El Segundo, CA 90245.

## ATTACHMENT 5F TO ORDER FOR WRIT OF POSSESSION

1) 950 Artesia Blvd., Hermosa Beach, CA 90254;

2) 917 Manhattan Beach Blvd., Manhattan Beach, CA 90266;

3) 916 Manhattan Ave., Manhattan Beach, CA 90266;

4) 3300 Highland Ave., Manhattan Beach, CA 90266;

5) 16 Malaga Cove Plaza, Palos Verdes Estates, CA 90274;

6) 431 Main Street, El Segundo, CA 90245;

7) 1009 Torrance Blvd., Redondo Beach, CA 90277;

8) 1543 E. Palmdale Blvd., Suite N, Palmdale, CA 93550;

9) 72960 Fred Waring Dr., Suite 110, Palm Desert, CA 92260;

10) 205 Pier Ave., Suite 201, Hermosa Beach, CA 90254;

11) 1230 Rosecrans Ave., #160, Manhattan Beach, CA 90266;

12) 3201 Manhattan Ave., Hermosa Beach, CA 90254;

13) 805 Manhattan Ave., Manhattan Beach, CA 90266;

14) 717 Yarmouth Road, Palos Verdes, CA 90274;

15) 1148 Manhattan Ave., #6, Manhattan Beach, CA 90266;

16) 3508 Highland Ave., Manhattan Beach, CA 90266;

17) 1020 Manhattan Beach Blvd., Suite 106, Manhattan Beach, CA 90266;

18) 2141 Rosecrans Ave., Suite 1160, El Segundo, CA 90245.

# EXHIBIT F



CD-120

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Calvin E. Davis (SBN: 101640); Aaron P. Rudin (SBN: 223004)<br>GORDON & REES LLP<br>633 West FIfth STreet, Suite 5200<br>Los Angeles, CA 90071<br>TELEPHONE NO.: 213-576-5000    FAX NO. *(Optional)*: 213-680-4470<br>E-MAIL ADDRESS *(Optional)*: cdavis@gordonrees.com; arudin@gordonrees.com<br>ATTORNEY FOR *(Name)*: ERA Franchise Systems, LLC | **CONFORMED COPY**<br>**ORIGINAL FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>JUN 15 2016<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By  P. Schultz,  Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 825 Maple Ave.
MAILING ADDRESS: 825 Maple Ave
CITY AND ZIP CODE: Torrance, CA 90503
BRANCH NAME: Torrance Courthouse

RECEIVED
JUN  9 2016
SOUTHWEST DISTRICT

PLAINTIFF: ERA Franchise Systems, LLC

DEFENDANT: LBH National Corporation

| ORDER FOR WRIT OF POSSESSION<br>☒  AFTER HEARING    ☐  EXPARTE | CASE NUMBER:<br>YC071137 |
|---|---|

**AFTER HEARING**

1. ☒  The application of the plaintiff* for a writ of possession was heard as follows *(check boxes in 1c and 1d to indicate personal presence at the hearing)*:

   a. Judicial Officer *(name)*: Stuart M. Rice

   b. Hearing date: June 9, 2016    Time: 8:30 a.m.    ☐  Dept.: B    ☐  Rm.:

   c. ☒  Plaintiff *(name)*: ERA Franchise Systems, LLC    ☒  Attorney *(name)*: Calvin E. Davis; Daniel M. Eliades

   d. ☒  Defendant *(name)*: LBH National Corporation    ☒  Attorney *(name)*: Stephen T. Holzer; Robert F. Salkowski

**EX PARTE**

2. ☐  The application of the plaintiff for an ex parte writ of possession has been considered by the court.

3. The court finds:

   a. ☒  Defendant has been properly served as required by Code of Civil Procedure section 512.030.
      *(Do not check this item if the application is ex parte.)*

   b. Plaintiff ☐ has ☒ has not    filed an undertaking as required by Code of Civil Procedure section 515.010.

   c. Plaintiff has established the probable validity of the plaintiff's claim to possession of the following property *(specify)*:

   ☒  Continued on Attachment 3c.

   d. ☒  There is probable cause to believe this property or some part of it is located at one or more of the following private places *(specify)*:

   ☒  Continued on Attachment 3d.

   *"Plaintiff" includes cross-complainant, and "defendant" includes cross-defendant.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CD-120 [Rev. January 1, 2006] | ORDER FOR WRIT OF POSSESSION<br>(Claim and Delivery) | Code Civ. Proc., §§ 512.020; 512.030;<br>512 070, 514.010–514.050; 515.010<br>www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

CD-120

| PLAINTIFF: ERA Franchise Systems, LLC | CASE NUMBER |
|---|---|
| DEFENDANT: LBH National Corporation | YC071137 |

## ADDITIONAL FINDINGS FOR EX PARTE ISSUANCE OF WRIT OF POSSESSION

4. ☐ The court also finds:

   a. ☐ Defendant gained possession of the property described in item 3c, which was not entrusted to the defendant, by feloniously taking such property from the plaintiff by means other than by false or fraudulent representation, pretense, or embezzlement.

   b. ☐ The property is a credit card.

   c. ☐ Defendant acquired possession of this property in the ordinary course of the defendant's trade or business for commercial purposes, and (1) the property is not necessary for the support of the defendant or the defendant's family; (2) there is an immediate danger that the property will become unavailable to levy by reason of being transferred, concealed or removed from the state, or will become substantially impaired in value by acts of destruction, or by failure to take care of the property in a reasonable manner; and (3) the ex parte issuance of a writ of possession is necessary to protect the property.

   d. Total number of boxes checked in item 4: _____

## ORDERS

5. IT IS ORDERED

   a. The clerk of this court is directed to issue a writ of possession as provided in Code of Civil Procedure section 512.020, directing the sheriff or marshal within whose jurisdiction the property described in item 3c, or some part of it, is located, to seize such property and retain custody of it as provided in Code of Civil Procedure sections 514.010-514.050.

   b. ☒ The clerk is directed to issue the writ of possession immediately.

   c. ☐ The clerk is directed to issue the writ of possession upon the plaintiff's filing of a written undertaking, as required by Code of Civil Procedure section 515.010, in the amount of: $

   d. The written undertaking required by the defendant for redelivery or to stay delivery is in the amount of: $5,350,000.00

   e. The clerk of this court is directed to attach a copy of this order and a copy of the plaintiff's undertaking to the writ of possession.

   f. The sheriff or marshal may enter the following private place(s) to take possession of the property or some part of it:

     ☒ Continued on Attachment 5f.

   g. ☒ Defendant *(name):* LBH National Corporation
is ordered to transfer possession of the property described in item 3c to the plaintiff. (Code Civ. Proc., § 512.070.)

NOTICE TO DEFENDANT: Failure to comply with an order of the court to turn over possession of such property to the plaintiff may subject you to being held in contempt of court.

6. Number of pages attached: 3

Dated: June 8, 2016

_____
STUART M. RICE
(JUDICIAL OFFICER)

☐ Signature follows last attachment.

CD-120 [Rev. January 1, 2005]

**ORDER FOR WRIT OF POSSESSION**
**(Claim and Delivery)**

Page 2 of 2

American LegalNet, Inc.
www.USCourtForms.com

## ATTACHMENT 3C TO ORDER FOR WRIT OF POSSESSION

All LBH National Corporation's ("LBH's") accounts, accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in LBH's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions (except for those due to agents at closing); real estate listings and listing agreements which are located at or related to the residential real estate brokerage business conducted by LBH and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program to which LBH is entitled pursuant to any franchise agreement entered into with ERA Franchise Systems, LLC, together with all such rights and property hereafter acquired by LBH, and all general intangibles which are identified by the marshal (collectively, the "Collateral") as well as parts, replacements, substitutions, profits, products and cash and not cash proceeds (i.e. consideration other than cash) of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto).

## ATTACHMENT 3D TO ORDER FOR WRIT OF POSSESSION

1) 950 Artesia Blvd., Hermosa Beach, CA 90254;

2) 917 Manhattan Beach Blvd., Manhattan Beach, CA 90266;

3) 916 Manhattan Ave., Manhattan Beach, CA 90266;

4) 3300 Highland Ave., Manhattan Beach, CA 90266;

5) 16 Malaga Cove Plaza, Palos Verdes Estates, CA 90274;

6) 431 Main Street, El Segundo, CA 90245;

7) 1009 Torrance Blvd., Redondo Beach, CA 90277;

8) 1543 E. Palmdale Blvd., Suite N, Palmdale, CA 93550;

9) 72960 Fred Waring Dr., Suite 110, Palm Desert, CA 92260;

10) 205 Pier Ave., Suite 201, Hermosa Beach, CA 90254;

11) 1230 Rosecrans Ave., #160, Manhattan Beach, CA 90266;

12) 3201 Manhattan Ave., Hermosa Beach, CA 90254;

13) 805 Manhattan Ave., Manhattan Beach, CA 90266;

14) 717 Yarmouth Road, Palos Verdes, CA 90274;

15) 1148 Manhattan Ave., #6, Manhattan Beach, CA 90266;

16) 3508 Highland Ave., Manhattan Beach, CA 90266;

17) 1020 Manhattan Beach Blvd., Suite 106, Manhattan Beach, CA 90266;

18) 2141 Rosecrans Ave., Suite 1160, El Segundo, CA 90245.

## ATTACHMENT 5F TO ORDER FOR WRIT OF POSSESSION

1) 950 Artesia Blvd., Hermosa Beach, CA 90254;

2) 917 Manhattan Beach Blvd., Manhattan Beach, CA 90266;

3) 916 Manhattan Ave., Manhattan Beach, CA 90266;

4) 3300 Highland Ave., Manhattan Beach, CA 90266;

5) 16 Malaga Cove Plaza, Palos Verdes Estates, CA 90274;

6) 431 Main Street, El Segundo, CA 90245;

7) 1009 Torrance Blvd., Redondo Beach, CA 90277;

8) 1543 E. Palmdale Blvd., Suite N, Palmdale, CA 93550;

9) 72960 Fred Waring Dr., Suite 110, Palm Desert, CA 92260;

10) 205 Pier Ave., Suite 201, Hermosa Beach, CA 90254;

11) 1230 Rosecrans Ave., #160, Manhattan Beach, CA 90266;

12) 3201 Manhattan Ave., Hermosa Beach, CA 90254;

13) 805 Manhattan Ave., Manhattan Beach, CA 90266;

14) 717 Yarmouth Road, Palos Verdes, CA 90274;

15) 1148 Manhattan Ave., #6, Manhattan Beach, CA 90266;

16) 3508 Highland Ave., Manhattan Beach, CA 90266;

17) 1020 Manhattan Beach Blvd., Suite 106, Manhattan Beach, CA 90266;

18) 2141 Rosecrans Ave., Suite 1160, El Segundo, CA 90245.

<u>PROOF OF SERVICE</u>

    I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is: Gordon & Rees LLP 633 West Fifth Street, 52nd Floor, Los Angeles, CA 90071. On June 9, 2016, I served the within documents:

ORDER FOR WRIT OF POSSESSION AFTER HEARING

☐  by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery by FedEx as part of the ordinary business practices of Gordon & Rees LLP described below, addressed as follows:

☒  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California at Los Angeles, addressed as set forth below.

Stephen Holzer
Sam Wolf
Lewitt Hackman, et al.
16633 Ventura Blvd., 11th Floor
Encino, CA 91436
Telephone: (818) 907-3299
Fax: (818) 981-4764
E-Mail: sholzer@lewitthackman.com

*Pro Hac Vice*
Robert Zarco
Robert F. Salkowski
Alaina B. Siminovsky
Zarco Einhorn Salkowski & Brito, P.A.
100 S.E. 2nd Street, Suite 2700
Miami, FL 33131
Telephone: (305) 374-5418
Fax: (305) 374-5428

*Attorneys for Defendants and Cross-Complainants*
*LBH National Corporation and Roger A. Herman*

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

    Executed on June 9, 2016 at Los Angeles, California.

                        _Sandy Halvorsen_
                          Sandy Halvorsen

Gordon & Rees LLP
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071

1116021/27S0626+v.1